Milton PFEIFFER, Plaintiff,

v.

Bruce E. TOLL; Robert I. Toll; Zvi Barzilay; Robert S. Blank; Joel H. Rassman; Richard Braemer; Paul E. Shapiro; and Carl B. Marbach, Defendants,

and

Toll Brothers, Inc., a Delaware Corporation, Nominal, Defendant.

C.A. No. 4140–VCL.

Court of Chancery of Delaware.

Date Submitted: Dec. 3, 2009.
Date Decided: March 3, 2010.

Carmella P. Keener, Jessica Zeldin, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Robert C. Schubert, Willem F. Jonckheer, Schubert Jonckheer

Kolbe & Kralowec LLP, San Francisco, California; Joseph Levi, Levi & Korsinsky, LLP, New York, New York, Attorneys for Plaintiff.

Allen M. Terrell, Jr., Brock E. Czeschin, Richards, Layton & Finger, P.A., Wilmington, Delaware, Attorneys for Defendants Bruce E. Toll, Robert I. Toll, Zvi Barzilay and Joel H. Rassman.

Anthony W. Clark, Kimberly A. LaMaina, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; Robert E. Zimet, Christopher P. Malloy, William F. Clarke, Jr., Daniel M. Gonen, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, Attorneys for Defendants Robert S. Blank, Richard Braemer, Carl B. Marbach, and Paul E. Shapiro.

A. Gilchrist Sparks, III, S. Mark Hurd, Ryan D. Stottmann, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, Attorneys for Nominal Defendant Toll Brothers, Inc.

## OPINION

LASTER, Vice Chancellor.

Plaintiff Milton Pfeiffer is a stockholder of nominal defendant Toll Brothers, Inc. ("Toll Brothers" or the "Company"). He brought this action to recover damages suffered by Toll Brothers resulting from alleged insider trading by the defendants. The defendants have moved to dismiss his Verified Amended Shareholder Derivative Complaint (the "Complaint"). I deny the motion.

## I.  FACTUAL BACKGROUND

I assume the following facts to be true for purposes of the motion to dismiss. The facts are drawn from the allegations of the Complaint, from publicly available documents it incorporates by reference, and from information subject to judicial notice, such as the historical prices at which securities traded on the public markets.

## A.  The Individual Defendants

The individual defendants account for eight of the eleven members of the board of directors of Toll Brothers (the "Board") at the time this action was filed. The eight individual defendants all sold significant amounts of stock during the period from December 2004 through September 2005. The Complaint alleges they did so while in possession of material, non-public information about Toll Brothers' future prospects.

Defendant Robert I. Toll ("R.Toll") and his brother, defendant Bruce E. Toll ("B.Toll"), co-founded the Company's predecessor in 1967. The current entity was incorporated in May 1986 in preparation for an initial public offering in June 1986. R. Toll has served since 1986 as the Company's Chairman and Chief Executive Officer. B. Toll served from 1986 until 1998 as the Company's President and Chief Operating Officer. B. Toll continues to serve as a director and as a paid consultant to the Company.

Defendants Zvi Barzilay and Joel H. Rassman are senior officers of the Company. Barzilay joined Toll Brothers' predecessor in 1980 and has been the Company's Chief Operating Officer since 1998. He has been a director since 1994. Rassman joined Toll Brothers' predecessor in 1984 and has been the Company's Executive Vice President, Treasurer, and Chief Financial Officer since 2002. He has been a director since 1996. I refer to R. Toll, Barzilay, and Rassman as the "Officer Defendants."

Defendants Robert S. Blank, Richard Braemer, Carl Marbach, and Paul E. Shapiro are outside directors of Toll Brothers. I refer to them as the "Outside Director

Defendants." B. Toll is *sui generis*. He is not currently an officer of the Company; nor is he an independent, outside director.

## B. Toll Brothers

Nominal defendant Toll Brothers is a Delaware corporation with its headquarters in Horsham, Pennsylvania. The Company designs, builds, markets, and arranges financing for single-family homes in luxury residential communities throughout the United States. Its shares trade publicly on the New York Stock Exchange under the symbol "TOL."

Toll Brothers' business model turns on developing residential communities, and a key operating metric is the number of communities where Toll Brothers is actively selling homes. Relatedly, a key driver of the Company's future performance is the number of communities where Toll Brothers has received regulatory approval to build homes. Toll Brothers can then start taking orders for homes, which in turn generate the Company's earnings three to four quarters later, when the sales close.

Toll Brothers' senior management closely monitors a range of metrics relating to the Company's core business. The Complaint quotes from Toll Brothers' 2004 annual report, which describes a process by which the entire senior management team reviews in detail three times per year the progress of each community owned or controlled by Toll Brothers. The Complaint alleges that on earnings calls R. Toll referred to written reports comparing community traffic by year and by month, stated that senior management closely monitored the Company's backlog on a weekly basis, and noted that senior management received weekly sales reports from each selling community. In addition to these Company statements, the Complaint quotes an article from the April 8, 2005 issue of *Fortune* that further describes the Company's internal monitoring of core business metrics.

## C. Toll Brothers' Projections Of 20% Net Income Growth

In 2003 and 2004, the luxury residential market experienced booming growth. Toll Brothers rode the wave to record financial performance. Revenues in 2003 increased by 19% over 2002, then increased again in 2004 by another 40% over 2003.[1] Closings in 2003 were up 11% over 2002, then up another 35% in 2004. Backlog in 2003 was up 39% over 2002, then grew by another 44% in 2004. Toll Brothers announced record earnings per share for the fourth quarter of 2004, up 87% over fourth quarter 2003.

Against the backdrop of this parabolic trend, Toll Brothers predicted greater things to come. In the letter to stockholders in the Company's 2004 annual report, Toll Brothers projected "at least 20%" growth in net income for 2006. This projection was based on the Company adding 20 new communities by the end of 2005, thereby increasing its total communities from 220 to 240. The letter to stockholders rejected the notion that there was a "housing bubble" that was about to pop. Signed by R. Toll, B. Toll, and Barzilay, the letter stated: "We strongly disagree: we believe demand is being driven by fundamental demographics and home prices are rising due to the imbalance between supply and demand." The letter explained that Toll Brothers' "luxury brand" was

---

1. All references to quarters or years refer to the Company's fiscal quarters and years, unless otherwise indicated. The Company's fiscal quarters are, in order: from November 1 through January 31; from February 1 through April 30; from May 1 through July 31; and from August 1 through October 30.

"less affected by rising mortgage rates" and stated that "it should be a long time before rates make a difference to our luxury home buyers."

Throughout the first eleven months of 2005, Toll Brothers reiterated its projection of 20% net income growth in 2006 and again in 2007. The Complaint describes Toll Brothers' public filings and quotes relevant statements. Even as Toll Brothers' operating results continued their parabolic trend, Toll Brothers stood by the projections of 20% net income growth in both 2006 and 2007.

The Complaint describes in detail the Officer Defendants' efforts to buttress the projections against market concern. As the markets became worried about a housing bubble during mid–2005 and began to question the ability of homebuilders to maintain their red-hot performance, the Officer Defendants expressed all the more confidence in Toll Brothers' projections. They asserted that they did not perceive any downturn in the housing market, and they represented that the Company was uniquely positioned to weather any problems that might occur. According to the Officer Defendants, Toll Brothers catered to a niche market of luxury home buyers who were not affected by rising interest rates. They discounted indications that traffic in the Company's communities was slowing and that the rate at which new contracts were signed was declining. They downplayed regulatory delays that were hampering Toll Brothers' efforts to open new communities.

For example, in May 2005, Toll Brothers reported record earnings for both the second quarter and the six-month mark. R. Toll reiterated his expectation that the Company would open 20 new selling communities in 2005 and end the year with approximately 240 communities. Rassman reiterated the projection of another 20%

growth in net income for 2006. Although sales in California fell, the Officer Defendants explained that the decline "was not due to a lack of demand, but rather to a lack of supply as we've sold out of several communities at a faster pace than we have been able to open up new ones." In a conference call to discuss the results, R. Toll stated:

> We believe Toll Brothers marches to a different beat in the housing market, in general, due to our luxury market rates and the land we control in some of the most desired locations. We believe luxury buyers are less impacted by interest rate hikes than less affluent buyers are affected.

During the same call, he asserted that Toll Brothers' sales were not being driven by speculative investors: "[W]e try not to sell to speculators. We train our sales associates how to spot them." He admitted that more buyers were using interest-only loans to purchase Toll Brothers' homes and that Toll Brothers encouraged the practice.

In July 2005, Rassman appeared on CNBC. When asked about the risk of a decline in home sales, he replied that Toll Brothers "[doesn't] currently see any indications on a national basis that that's happening, either slowdown in regulation or a change in the balance between supply and demand." Rassman reiterated his views in an interview a day later with Bloomberg News, where he stated: "We don't see any let-up in terms of demand or our ability to produce profits."

In August 2005, Toll Brothers announced third quarter preliminary results. R. Toll projected that Toll Brothers would end 2005 with 237 selling communities and would have 265 selling communities by the end of 2006. He reaffirmed the Company's previous projections of 20% growth in net income for 2006, and yet another 20%

net income growth in 2007. In a conference call to discuss the preliminary results, R. Toll said he did not believe the pace of sales had slowed down at all. Rassman also said that the sales pace had not slowed. R. Toll stated that demand on the West Coast was "very strong" and that while two isolated markets had cooled a bit, they were "still hotter than a normal market." R. Toll claimed the decline in sales was initiated by Toll Brothers. According to him, the "buyer appetite [was] so healthy" that Toll Brothers had "chosen to hold off taking new home sale contracts . . . to ration our supply to maximize profit."

Analysts latched on to these statements. On August 4, 2005, J.P. Morgan issued a report stating: "[C]ritically, [the Company] reaffirmed its [2005 and 2006] net income guidance of 70% and 20% respectively." An analyst with Susquehanna Group stated: "Our post conference call view actually brightens a bit despite some conservative posturing by management." Another analyst stated: "We believe even more strongly about the positive three-year outlook for [the Company] following the call."

On August 16, 2005, R. Toll appeared on CNBC to discuss the Company's third quarter results. He stated: "We don't see a housing bubble. The market is fantastic. We're enjoying exactly where we are." Six days later, on August 21, *The New York Times* published an article about Yale economist Robert Shiller, who had written a book about the possible housing bubble. R. Toll was quoted as saying, "Shiller is predicting the mountain goes into the sea. He's selling himself."

On August 25, 2005, Toll Brothers announced its third quarter results. R. Toll stated that the Company was "on track" for "approximately 20% net income growth in both 2006 and 2007." In the quarterly earnings call, R. Toll suggested that the

third quarter results "should give confidence to investors that our results and prospects are not as cyclical as the market seems to be anticipating." He reaffirmed the projection of 20% growth for 2006.

After the quarterly earnings call, Rassman appeared on several television shows. In an interview on August 25, 2005, Rassman stated that the Company "firmly believe[s] that the price of the stock will continue to go up." In another interview that day, he described the Company's business prospects as "spectacular." He elaborated: "Everything looks like we will have another record year this year and another record year next year. So, we are already projecting records for 2006 and an additional 20% growth in 2007."

On October 3, 2005, *USA Today* published an article on Toll Brothers. R. Toll was quoted as saying: "We expect 2005 to be 80% up over '04, and we expect an approximately 20% increase for '06 [and in] '07 . . . we expect[ ] a 20% increase over '06. So that's pretty good moving and grooving." On October 16, *The New York Times* published an article on Toll Brothers. R. Toll was cited as expecting Toll Brothers to "grow by 20 percent for the next two years and then will strive for 15 percent annually after that."

### D. The Downward Revisions In December 2005

On November 8, 2005, Toll Brothers announced its preliminary fourth quarter results for 2005. Although the Company again reported record net income, management's tone was tempered. R. Toll was quoted as saying that despite the Company's record performance for the quarter, "we believe a shortage of selling communities, coupled with some softening of demand in a number of markets, negatively impacted our contract results." He blamed "an increasingly complex regulato-

ry process" for delays in opening new communities and announced that the Company had reached only 230 selling communities by October 31, short of the 237 communities he had projected on August 25. He added that the Company would stay at 230 selling communities through the end of the first quarter of 2006. During management's conference call to discuss the numbers, they cited "softening" demand that was being seen "pretty much across the board." R. Toll stated that foot traffic—people visiting the Company's selling communities—had been "down for about a year."

On December 8, 2005, Toll Brothers reported its 2005 results. The release explained that despite "record fiscal year and fourth-quarter results for earnings, revenues, backlog and contracts," the housing market was "not as robust today as it was throughout 2004." Management lowered its annual growth projections for 2006 to just 0.5% and reiterated that Toll Brothers would stay at 230 selling communities through the first quarter of 2006. This was the first time Toll Brothers modified its projection of 20% net income growth in 2006, and the number fell off a cliff to 0.5%.

The reaction from the media and analysts was profoundly negative. Susquehanna Financial Group issued a report titled, "TOL Creates an Unforgettable Day in the Homebuilder Universe." Susquehanna noted that order growth and selling-communities growth had "disappear[ed]" and that the negative results were "completely unexpected." The *Dallas Morning News* reported that "toxic words crossed the wires: 'softening demand.'"

The Complaint explains that Toll Brothers' actual results for 2006 and 2007 were even more disappointing than the downwardly revised projections anticipated. I do not dwell on the actual results in 2006

and 2007 because the claims in this action must rise or fall based on what the defendants knew in 2005, not whether they accurately foresaw what would happen in 2006 and 2007.

### E. The Defendants' Knowledge Prior to December 2005

The Complaint alleges that from December 2004 on, the defendants knew their representations about 2006 and 2007 had no reasonable basis in fact. The defendants admitted in December 2005 that foot traffic was down for "about a year" and fewer prospective customers were visiting Toll Brothers' communities. They also knew that the rate at which new contracts were signed was trending lower throughout 2005, although they attempted to explain it away and even claimed that Toll Brothers caused the trend by "ration[ing] supply to maximize profit." They also knew that the regulatory approval process was becoming increasingly complex and time consuming, such that their projections about the number of selling communities that could be opened were no longer accurate. Without new communities, Toll Brothers could not make sales or achieve projected earnings growth. Because the community approval process takes months, the defendants knew those trends well before they reduced their projections.

### F. The Performance Of Toll Brothers' Stock Price

During the period of time when Toll Brothers' management was projecting 20% growth in net income for 2006 and 2007, Toll Brothers' common stock significantly outperformed the S & P Homebuilders Index, a peer index of large, national homebuilders. Prior to late 2004, when Toll Brothers began to make its 20% projections, Toll Brothers traded in line with the index. During the time that Toll

Brothers was projecting 20% growth in net income for 2006 and 2007, the trading price of Toll Brothers' stock more than doubled, from $28.50 in December 2004 to over $58.00 in July 2005.

During this same period, and particularly during the summer and fall of 2005, the defendants sold shares. The eight defendants collectively sold 14 million shares for proceeds of over $615 million. Barzilay sold 92% of his shares. Blank sold 93% of his shares. Shapiro sold 84% of his shares. Marbach sold 82% of his shares. Rassman sold 68% of his shares. Braemer sold 52% of his shares. B. Toll and R. Toll, who during their long tenures as cofounders of the Company had not previously sold significant amounts of stock, respectively sold 37% and 29% of their shares. These trades were inconsistent with the past trading patterns and are suspicious in timing and amount.

## II. LEGAL ANALYSIS

The Complaint sets forth two counts. Count I asserts a claim for breach of fiduciary duty under *Brophy v. Cities Service Co.*, 70 A.2d 5 (Del.Ch.1949), which recognized the right of a Delaware corporation to recover from its fiduciaries for harm caused by insider trading. Count II asserts a generalized claim for contribution and indemnification. The defendants (including Toll Brothers as nominal defendant) have moved to dismiss these claims. First, all defendants contend that the Complaint fails to plead demand futility for purposes of Court of Chancery Rule 23.1. Second, all defendants contend that the statute of limitations bars any claims

based on the individual defendants' stock sales. Third, the Outside Director Defendants argue that a claim for breach of fiduciary duty has not been pled as to them. Finally, and most boldly, the defendants argue that Delaware should abandon its traditional role of policing against breaches of the duty of loyalty by fiduciaries of Delaware corporations, at least where the underlying wrong involves insider trading, and that *Brophy* is an outdated precedent that should be rejected.[2]

### A. The Complaint Adequately Pleads Demand Futility.

■ I start with demand futility. In 2003, Vice Chancellor Strine explained how the demand futility analysis operates when a plaintiff contends that a majority of a board of directors sold stock based on confidential corporate information. *Guttman v. Huang*, 823 A.2d 492, 499–507 (Del. Ch.2003). For reasons he ably set forth at some length, the demand futility inquiry is governed by *Rales v. Blasband*, 634 A.2d 927 (Del.1993). The operative question is whether the Board could impartially consider the merits of a demand without being influenced by improper considerations. *Guttman*, 823 A.2d at 501.

As the *Guttman* decision explains, directors can be compromised for purposes of considering a demand if they face a significant likelihood of liability relating to the subject matter of the complaint. *Id.* at 503. The test is "whether the plaintiffs have pled facts that show [the] directors face a sufficiently substantial threat of per-

---

**2.** *See* Opening Brief In Support Of The Motion To Dismiss The Amended Complaint of Defendants Blank, Braemer, Shapiro And Marbach On The Grounds That *Brophy v. Cities Service Co.* Should Be Rejected And Plaintiff Has Failed To State A Breach Of Duty Of Loyalty Claim (hereinafter "Def. Op.

Br."); Reply Brief In Support Of The Motion To Dismiss The Amended Complaint of Defendants Blank, Braemer, Shapiro And Marbach On The Grounds That *Brophy v. Cities Service Co.* Should Be Rejected And Plaintiff Has Failed To State A Breach Of Duty Of Loyalty Claim.

sonal liability to compromise their ability to act impartially on a demand." *Id.*

*Guttman* considered this issue solely with respect to the claims asserted in the derivative action itself. Vice Chancellor Strine did not need to consider the implications of a companion federal securities action because, as he observed, "none of [the outside director] defendants is even named as a defendant in the pending federal securities suits." *Id.* at 504. Moreover, at the time Vice Chancellor Strine ruled, the federal securities lawsuits had been dismissed. *Id.*

Later in 2003, Vice Chancellor Noble considered the existence of pending federal securities actions while determining whether plaintiffs adequately pled demand futility for a breach of fiduciary duty claim to recover for insider trading. *Rattner v. Bidzos,* 2003 WL 22284323, at *1 (Del.Ch. Sept.30, 2003). He noted:

> The only particularized facts contained in the Amended Complaint regarding the federal securities class action lawsuits are that such suits were filed and are pending in the Northern District of California. One is left to guess at which of the Individual Defendants, indeed if any of the Director Defendants, are defendants in the federal securities class action lawsuits.

*Id.* at *14. Vice Chancellor Noble held that "conclusory and cryptic allegations" about a companion federal securities action were insufficient to merit demand excusal under *Rales. Id.*

This case is different. All of the individual defendants, including the four Outside Director Defendants, are named defendants in a companion federal securities action. The complaint in that action survived a motion to dismiss under the rigorous standards for pleading securities fraud. *City of Hialeah Employees' Ret. Sys. and Laborers Pension Trust Funds v.*
*Toll Bros., Inc.,* 2008 WL 4058690, at *1 (E.D.Pa. Aug.29, 2008). The district court held that the complaint sufficiently alleged that the defendants "made material representations and omissions of material fact" in connection with "future projections" for 2006 and 2007 that were "knowingly unreasonable" at the time they were made. *Id.* at *2. The district court further held that the insider trading of the individual defendants—essentially the same trades at issue here—raised a "powerful and cogent inference of *scienter*" and was "unusual in scope and timing." *Id.* at *5.

In light of the federal securities action, it is not possible for the defendants in this case, who comprised a majority of the Board when the suit was filed, to consider a demand impartially. If the Company pressed forward with its rights of action against the defendants in this case, then the Company's efforts would undercut or even compromise the defense of the federal securities action. Under *Rales, Guttman,* and *Rattner,* demand is futile.

## B. The Complaint Adequately Pleads A Basis For Tolling The Statute Of Limitations.

■ I next consider the defendants' contention that the statute of limitations bars any claim based on the defendants' trading. The plaintiff filed this action on November 4, 2008. The Complaint challenges stock sales made by the defendants between December 2004 and September 2005. A three year statute of limitations applies to claims for breach of fiduciary duty. 10 Del. C. § 8106; *In re Tyson Foods, Inc.,* 919 A.2d 563, 584 (Del.Ch. 2007). In applying the equitable doctrine of laches, this Court typically follows the analogous statute of limitations. *Reid v. Spazio,* 970 A.2d 176, 183 (Del.2009). Absent a basis for tolling, this action was not timely filed.

I am satisfied for pleadings purposes that a basis for tolling exists. This Court has stated:

> Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary. Underlying this doctrine is the idea that even an attentive and diligent investor may rely, in complete propriety, upon the good faith of fiduciaries.

*Weiss v. Swanson,* 948 A.2d 433, 451 (Del. Ch.2008). Moreover, in a well-known decision issued last year, Vice Chancellor Strine held:

> The obvious purpose of the equitable tolling doctrine is to ensure that fiduciaries cannot use their own success at concealing their misconduct as a method of immunizing themselves from accountability for their wrongdoing.
>
> * * *
>
> Many of the worst acts of fiduciary misconduct have involved frauds that personally benefited insiders as an indirect effect of directly inflating the corporation's stock price by the artificial means of cooking the books. To allow fiduciaries who engaged in illegal conduct to wield a limitations defense against stockholders who relied in good faith on those fiduciaries when their disclosures provided no fair inquiry notice of claims would be inequitable.

*In re Am. Int'l Group Inc.,* 965 A.2d 763, 813 (Del.Ch.2009) (hereinafter *"AIG"*).

In discussing Toll Brothers' prospects from December 2004 until December 2005, senior management remained positive and consistently reaffirmed their growth projections. Whenever Toll Brothers management mentioned negative factors, such as cooling in some markets, they balanced them with positive and reassuring statements. In light of this mix of communications, "it is a reasonable inference that the public was not aware of [the Company's] true predicament because its problems—even if they had been partially disclosed—were likely overshadowed by the public hyperbole of [the Company's] executives." *Zimmerman v. Braddock,* 2005 WL 2266566, at *8 (Del.Ch. Sept.8, 2005), *rev'd on other grounds,* 906 A.2d 776 (Del.2006).

It was not until December 8, 2005, that management officially abandoned the projection of 20% growth that forms the centerpiece of the Complaint. I hold that the statute was equitably tolled until December 8, 2005. This action was thus timely filed.

### C. The Complaint Adequately Pleads That The Defendants Engaged In Insider Trading.

■ The Outside Director Defendants argue that the Complaint fails to state a claim against them for breach of the duty of loyalty based on insider trading. I disagree.

"[A] plaintiff seeking to prevail on a *Brophy* claim ultimately must show that: 1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." *In re Oracle Corp.,* 867 A.2d 904, 934 (Del.Ch.2004) (hereinafter *"Oracle"*), *aff'd,* 872 A.2d 960 (Del.Supr.2005) (TABLE). This case is now at the pleadings stage.

The Complaint is not subject to any heightened pleading standard. The Outside Director Defendants contend that "[b]ecause an insider trading claim is a species of fraud, the heightened pleading requirements of Chancery Court 9(b) ap-

ply." Def. Op. Br. at 23. The defendants cite no authority for this proposition, and I reject it. The insider trading claim is not a fraud claim, but rather a breach of fiduciary duty claim. Rule 9(b) does not apply. Although a plaintiff must plead with particularity when attempting to establish demand futility, that is not the issue here. I have already held that demand is futile in light of the companion federal securities action, which brings the role of Rule 23.1 to a close. In *AIG*, when Rule 23.1 was similarly inapplicable, Vice Chancellor Strine evaluated the *Brophy* allegations under the plaintiff-friendly Rule 12(b)(6) standard, not a particularity standard. 965 A.2d at 800–01, 811. I will do the same.

When a plaintiff alleges that insiders traded on internal information inconsistent with projections previously provided to the market, the complaint must allege that the defendants possessed information about the company's performance that created a substantial likelihood of an extreme departure from projected results. *Oracle*, 867 A.2d at 939–40. The internal information known to the defendant can be hard, in the sense of actual historical operating results, or soft, in the sense of trends or projections. "The relative firmness of the information is simply one factor in the overall determination of materiality, albeit an important one." *Id.* at 939. This standard recognizes that good faith projections are just that—projections—and therefore subject to some degree of revision or variation as a matter of course. *Id.* at 939–40.

The "substantial likelihood" standard does not apply to the "slightly, but importantly, different question than is presented when plaintiffs seek damages by alleging that a forward-looking statement was itself materially misleading." *Oracle*, 867 A.2d at 935–37. Our Supreme Court addressed this latter question in *Malone v. Brincat,*

722 A.2d 5 (Del.1998), holding squarely that: "[D]irectors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances." 722 A.2d at 9. "When the directors are not seeking shareholder action, but are deliberately misinforming shareholders about the business of the corporation, either directly or by a public statement, there is a violation of fiduciary duty." *Id.* at 14.

The Outside Director Defendants argue that the Complaint does not plead facts showing that they "actually had knowledge of the purported material non-public information." Def. Op. Br. at 23. Even when Rule 9(b) applies—and here it does not—"knowledge or other condition of mind of a person can be averred generally." Ct. Ch. R. 9(b). Outside of the procedural context of Rule 23.1, a complaint need only plead a reasonable basis from which knowledge can be inferred.

The Complaint alleges that beginning in October 2004, Toll Brothers consistently and repeatedly projected 20% growth in net income during 2006 and 2007. The Complaint credibly alleges that based on Toll Brothers' own statements about the limits of the Company's visibility into its future prospects, and based on internal and closely monitored metrics, the defendants knew Toll Brothers could not meet those projections. The Complaint alleges that in November and December 2005 the Officer Defendants finally came clean to the public markets and admitted that throughout 2005 their internal metrics had been trending down.

The Complaint further alleges that to mollify market concern, the Officer Defendants expressed all the more confidence in their projections, engaging in behavior that more closely resembled unabashed

and unrestrained cheerleading. The Complaint describes statements by R. Toll to the effect that rising interest rates did not concern him, because the Company had continued to "blast and rock and roll" in other periods of interest rate hikes. At another point, when asked about substantial short-selling of Toll Brothers' stock, R. Toll responded: "The shorts are going to get crushed. You ain't seen nothing yet." R. Toll described the stock as a "fabulous" and "tremendous" buy at the same time he was unloading large blocks of his shares. He dismissed "bubble mania" and described Toll Brothers' business as "a match made in heaven."

A senior executive can be bullish about his company without sounding like he is auditioning to replace Jim Cramer on *Mad Money*. Juxtaposed against the allegations about the underlying trends in Toll Brothers' business, these statements are striking. Coupled with massive sales of securities, they amount to a red flag. They are sufficient to plead a claim for breach of fiduciary duty both under *Oracle* and *Malone*.

I recognize the need to distinguish between the Officer Defendants (along with B. Toll who signed on to the 2004 annual letter to stockholders) and the Outside Director Defendants. Several factors combine to convince me that knowledge and use of inside information is adequately pled under the plaintiff-friendly Rule 12(b)(6) standard. Principal among these factors is the nature of the information in question. The Complaint does not contend that outside directors should have uncovered financial fraud, second-guessed technical accounting judgments, or known about concerns expressed by low-level employees within the organization. The Complaint turns on information about the core operations of the Company and the basis for projections that it consistently provided to the markets for over a year. The projections were issued in preliminary earnings releases, final earnings releases, Form 10-Qs, and the 2004 Form 10-K. Senior management discussed the projections on earnings calls, during media appearances, and in interviews. The Complaint alleges that the projections were false for reasons that likewise relate to the core operations of the Company. Toll Brothers itself has described its focus on key metrics—like traffic through its communities, signed contracts, and the number of selling communities. Two of the Outside Director Defendants served on the audit committee, which had specific responsibility under its charter for earnings releases and earnings guidance.

Under Section 141(a) of the General Corporation Law, directors have the statutory power *and responsibility* to direct and oversee the business and affairs of the corporation. 8 Del. C. § 141(a). It would afford an ostrich-like immunity to directors not to grant the plaintiff a Rule 12(b)(6) inference that the Outside Director Defendants knew about core information of this type.

To defeat the Complaint's allegations of knowledge, the Outside Director Defendants rely on *Guttman* and *Rattner*. Both cases were decided under Rule 23.1's particularity standard and in a procedural posture where the plaintiff sought to establish demand futility by showing that the directors faced a substantial risk of liability. *Guttman*, 823 A.2d at 499; *Rattner*, 2003 WL 22284323, at *7-9. Both cases are therefore distinguishable. Both decisions also involved quite different types of inside information. Each arose out of accounting improprieties brought to light by a subsequent restatement. In addition to duty of oversight claims based on the accounting restatements, the plaintiffs in those cases challenged sales of stock by

senior officers and directors during the period covered by the restatements, claiming that knowledge of the improper accounting constituted inside information. Neither complaint explained how the directors would have known about the accounting problems. In *Guttman*, Vice Chancellor Strine declined to infer that the outside directors knew about the particular accounting misstatements at the time of the trades. 823 A.2d at 503–05. Facing a similar situation in *Rattner*, Vice Chancellor Noble followed *Guttman*. 2003 WL 22284323, at *9–11. Neither case involved the type of core operational information at issue here.

I also regard the trades made by the Outside Director Defendants as sufficiently unusual in timing and amount to support a pleading-stage inference that the sellers took advantage of confidential corporate information not yet available to the public to unload significant blocks of shares before the market's view of Toll Brothers' prospects dramatically changed. I thus find that the Complaint supports an inference that all of the individual defendants, including the Outside Director Defendants, made trades that were motivated, in whole or in part, by their knowledge of Toll Brothers' prospects. *Oracle*, 867 A.2d at 934; *accord AIG*, 965 A.2d at 800.

I reject the Outside Director Defendants' contention that inside information about Toll Brothers' true prospects was not material. Toll Brothers' consistent reiteration of its 20% net income growth projection, its performance relative to the S & P Homebuilders Index during the period the projection was being maintained, and the market reaction when Toll Brothers revised its projections in December 2005 all point to the materiality of that information. The Complaint sufficiently alleges that the defendants possessed material information about critical metrics that undercut the projection and indicated that it could not be achieved. Customer traffic, signed contracts, and active selling communities were measures that Toll Brothers monitored closely and that the Officer Defendants referred to in their public communications. I have no difficulty concluding at the pleadings stage that internal information about trends in these metrics was material to the 20% net income growth projection at some point prior to the cliff-like drop on December 8. Although the plaintiffs candidly concede that they cannot establish the exact moment in time when the defendants knew their projections could not be achieved, they have pled a claim that merits discovery. The defendants' actions during summer and fall 2005 are the most questionable, but I will not attempt to determine precisely when the defendants breached their fiduciary duties on a motion to dismiss.

I also reject the Outside Director Defendants' suggestion that they could have done a better job at insider trading. They point out that they sold their shares at a weighted-average price more than 20% below Toll Brothers' peak, arguing that if they were seeking to exploit inside information, "they presumably would have timed their sales to maximize their profits." Def. Op. Br. at 30. The fact that a defendant could have misused inside information more effectively does not defeat an otherwise valid inference of insider trading. *AIG*, 965 A.2d at 801. The Outside Director Defendants' fact-laden arguments about the materiality of their sales and different methods of calculating how much they sold require the resolution of factual disputes that are inappropriate for a Rule 12(b)(6) motion.

I therefore hold that the Complaint states a claim under *Brophy* against all of the defendants, including the Outside Di-

rector Defendants. This does not mean, of course, that the plaintiff will succeed on his claim. The Rule 12(b)(6) inference that I have granted will not aid the plaintiff at later stages of this litigation. He must ultimately prove his case, and the defendants (and particularly the Outside Director Defendants) will likely have strong defenses. *See, e.g.,* 8 Del. C. § 141(e).

### D. *Brophy* Remains Good Law.

Having rejected the defendants' other arguments for dismissal, I must confront their assertion that *Brophy* is no longer good law. The defendants characterize *Brophy* as a persistent anachronism from a time before the current federal insider trading regime, when this Court felt compelled to address insider trading because of the absence of any other remedy. The defendants thus view *Brophy* as a well-meaning stretch that is no longer needed and, worse, conflicts with federal policies and enforcement mechanisms. These are views I do not share.

*Brophy* was not a one-off decision. Ten years before *Brophy*, the Delaware Supreme Court issued its iconic warning to fiduciaries who selfishly misappropriate corporate assets, including confidential corporate information, for personal gain. *Guth v. Loft, Inc.,* 5 A.2d 503 (Del.1939). The Guth Court stated:

> Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders. A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous

observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale.

> If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit. The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation. Given the relation between the parties, a certain result follows; and a constructive trust is the remedial device through which precedence of self is compelled to give way to the stern demands of loyalty.

*Id.* at 510. Over seventy years later, *Guth v. Loft* remains the seminal Delaware decision addressing the duty of loyalty.[3]

---

**3.** *See Schoon v. Smith,* 953 A.2d 196, 206

(Del.2008) ("Our exposition of the duty of

In *Brophy*, Chancellor Harrington relied on these foundational principles in declining to dismiss a derivative claim brought against the executive secretary of one of the directors of Cities Service Company. 70 A.2d at 7–8. The secretary allegedly knew that Cities Service planned to make open-market purchases that would likely boost its stock price. The secretary purchased shares for his personal account in advance of the corporate repurchase and later sold the shares for a profit after the market price rose. *Id.* at 7. Chancellor Harrington recognized that "in the absence of special circumstances, corporate officers and directors may purchase and sell its capital stock at will, and without any liability to the corporation." *Id.* at 8. He nevertheless held that because the secretary acquired knowledge about the corporation's plans in the course of his employment, *i.e.* it was confidential corporate information, "the application of general principles would seem to require the conclusion that he cannot use that information for his own personal gain." *Id.* In broad language, Chancellor Harrington rejected the argument that the corporation suffered no harm as a result of the secretary's activities. He explained: "In equity, when the breach of a confidential relation by an employee is relied on and an accounting for any resulting profits is sought, loss to the corporation need not be charged in the complaint." *Id.* He continued: "Public policy will not permit an employee occupying a position of trust and confidence towards his employer to abuse that relation to his own profit, regardless of whether his employer suffers a loss." *Id.*

In the ensuing decades, the Delaware Supreme Court has cited *Brophy* approvingly when discussing how the duty of loyalty governs the misuse of confidential corporate information by fiduciaries.[4]

loyalty is traceable to *Guth v. Loft, Inc.*"); *Paramount Commc'n Inc. v. QVC Network Inc.*, 637 A.2d 34, 43 (Del.1994) ("It is basic to our law that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation. In discharging this function, the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders."); *Robotti & Co. v. Liddell*, 2010 WL 157474, at *11 (Del.Ch. Jan.14, 2010) ("[F]iduciaries in this context breach their duty of loyalty only if they knowingly and completely fail to undertake their responsibilities.") (internal citations omitted); 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 4.16, at 4–116, 4–117 (3d ed. 1998) ("[T]he directors are charged with a duty of loyalty to fulfill this obligation [to control corporate operations].") (citing *Guth*); 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 15.02[1], at 15–3, 15–5 (2004) ("The cases have articulated a duty of loyalty and selflessness associated with the director's fiduciary responsibility in language of the broadest sweep and scope.... For directors, however, the duty of loyalty to the corporation imposes some specific restric-

tions on their ability to operate ..., restrictions which find embodiment in the laws of corporate opportunity and insider trading.") (citing *Guth*); 1 Edward P. Welch et al., *Folk on Delaware General Corporation Law* at § 141.2.1.2, at GCL–IV–26 (5th ed. 2006) ("The duty of loyalty embodies both an affirmative duty to protect the interests of the corporation and an obligation to refrain from conduct that would injure the corporation and its stockholders or deprive them of profit or advantage.").

4.　*See Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991) ("[T]he absence of specific damage to a beneficiary is not the sole test for determining disloyalty by one occupying a fiduciary position. It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such profit or advantage is not gained at the expense of the fiduciary. The result is nonetheless one of unjust enrichment which will not be countenanced by a Court of Equity.") (citing *Brophy*); *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989) (citing *Brophy* as supporting duty of fair dealing by "those who are privy to material information obtained in the course of

This Court has repeatedly cited and applied it.[5]

The defendants nevertheless contend that "two members of this Court have recently called [*Brophy* ] into doubt in separate opinions." Def. Op. Br. at 5 (citing *Oracle*, 867 A.2d at 927, 929, and *Goldman v. Isaacs*, 2001 WL 1671439, at *1 (Del.Ch. Dec.17, 2001)). According to the defendants, this Court was itching to overrule *Brophy*, but lost its chance "because of settlement or disposition on other grounds." *Id.* at 6. The defendants' open-

ing brief did not mention *AIG*, a more recent decision in which Vice Chancellor Strine, the author of *Oracle*, applied *Brophy*.

*Goldman* was not an actual ruling, but rather a two-page letter from Chancellor Chandler requesting supplemental briefing. Faced with a motion to dismiss that the parties asked him to resolve without oral argument, Chancellor Chandler invited "concise supplemental memoranda" addressing three issues, two of which touched on *Brophy*. 2001 WL 1671439, at

representing corporate interests" and holding that "[a]t a minimum, this rule dictates that fiduciaries, corporate or otherwise, may not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations"); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del.1983) ("[O]ne possessing superior knowledge may not mislead any stockholder by use of corporate information to which the latter is not privy. Delaware has long imposed this duty even upon persons who are not corporate officers or directors, but who nonetheless are privy to matters of interest or significance to their company.") (citing *Brophy* ); *Singer v. Magnavox Co.*, 380 A.2d 969, 977 (Del.1977) (citing *Brophy* as one of many precedents enforcing the "fiduciary obligation of honesty, loyalty, good faith and fairness"), *overruled on other grounds by Weinberger*, 457 A.2d at 715; *see also Adams v. Jankouskas*, 452 A.2d 148, 152 (Del.1982) (citing *Brophy* as authority for imposing constructive trust "when a defendant's fraudulent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another to whom he owed some duty").

**5.** *See, e.g., AIG*, 965 A.2d at 800 ("A breach of fiduciary duty claim premised on insider trading, also known as a *Brophy* claim, arises where 1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information.") (internal quotations and citations omitted); *Latesco, L.P. v. Wayport, Inc.*, 2009 WL 2246793, at *6 (Del. Ch. July 24, 2009) ("A *Brophy* claim is funda-

mentally derivative in nature, because it arises out of the misuse of corporate property—that is, confidential information—by a fiduciary of the corporation, for the benefit of the fiduciary and to the detriment of the corporation.") (citing *Brophy* ); *Guttman*, 823 A.2d at 505 ("Delaware law has long held ... that directors who misuse company information to profit at the expense of innocent buyers of their stock should disgorge their profits.") (citing *Brophy); Rattner*, 2003 WL 22284323, at *10–11 ("Delaware has recognized a cause of action against directors who abuse their knowledge of a corporation's private information at the expense of unwitting purchasers of their stock.... [C]ritically, it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information.") (internal quotations omitted) (citing *Brophy* ); *Rosenberg v. Oolie*, 1989 WL 122084, at *3 (Del.Ch. Oct.16, 1989) ("The principle, as announced in *Brophy*, is that, if a person in a confidential or fiduciary position, in breach of his duty, uses his knowledge to make a profit for himself, he is accountable for such profit.") (internal quotations omitted) (citing *Brophy* ); *Stepak v. Ross*, 1985 WL 21137, at *5 (Del.Ch. Sept.5, 1985) ("It is, of course, clear that Warner is entitled to recover all insider profits made by the individual defendants if the individual defendants breached their fiduciary duties to Warner.") (citing *Brophy* ); *see also Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *7–8 (Del.Ch. Dec.29, 2009) (applying *Brophy*-like reasoning in partnership context); *Zimmerman*, 2005 WL 2266566, at *5, *7–8 (applying *Brophy*-like reasoning for insider-trading claims against directors).

*1. A federal judge had dismissed the companion federal securities action in the *Goldman* case, and the Chancellor asked the parties to address the changed federal landscape since 1949. The Chancellor stated:

> [F]ederal securities law, particularly Rule 10b–5, has changed a great deal since 1949. Developments in federal law have led to the creation of various federal remedies for market participants injured by insider trading, which raises three further questions. First, these federal remedies were unavailable when *Brophy* was decided, and absent recovery in a derivative suit, the defendant may not have faced liability for his actions. What effect, if any, should changes in federal law and the risk of double liability have on the applicability of *Brophy* to this case? Second, the federal legislation on insider trading in the last two decades has arguably preempted claims like the one made in Count I. What effect, if any, should the related federal securities class action have on Count I? Finally, the Securities Litigation Uniform Standards Act of 1998 expressly preserved derivative claims. How does that provision affect Count I?

*Id.* After raising an intervening issue about Section 102(b)(7), the Chancellor returned to *Brophy*:

> Under *Brophy* and its progeny, plaintiffs must establish a causal link between any confidential information allegedly possessed by insiders and any profits accumulated by those insiders. Are allegations that the Selling Defendants sold Guess common stock mere weeks before the announcement of negative information sufficient to establish both the Selling Defendants' knowledge of that information and the existence of such a causal link?

*Id.* (internal citations omitted). *Goldman* subsequently settled, and the Chancellor did not rule.

Defense counsel understandably viewed *Goldman* as an invitation to take on *Brophy*, and they accepted. Thus in litigation involving alleged trading by the two senior officers of Oracle Corporation, the defendants argued that "*Brophy* should no longer form part of Delaware's common law of corporations." *Oracle*, 867 A.2d at 927. The plaintiffs argued that *Brophy* should be strengthened and require automatic disgorgement of trading profits where a fiduciary possessed confidential information unless the transactions were entirely fair. *Id.* at 929. Finding that the defendants prevailed "under a reasoned application of *Brophy*," Vice Chancellor Strine declined "to conclude that *Brophy* is an outdated precedent that ought to be abandoned." *Id.* He therefore left that "important policy question" to a later case. *Id.*

Undeterred by *Oracle*, the defendants have reprised their anti-*Brophy* arguments. Because I have rejected the defendants' other bases for dismissal, the continued vitality of *Brophy* is dispositive. Unlike the defendants, I believe that Vice Chancellor Strine's "reasoned application of *Brophy*" serves the critical Delaware policy of policing against violations of the duty of loyalty. I further believe the doctrine is consistent with—and supportive of—the federal securities regime.

### 1. "A Reasoned Application Of *Brophy*"

In three post-*Goldman* decisions—*Guttman, Oracle*, and *AIG*—Vice Chancellor Strine has refined how *Brophy* operates. His decisions moot two attacks by the defendants, who claim *Brophy* operates duplicatively with the federal securities laws to recover losses by contemporaneous

traders and incoherently provides a corporate remedy without underlying harm.

A *Brophy* claim does not exist to recover losses by contemporaneous traders, nor to force automatic disgorgement of reciprocal insider trading gains. The purpose of a *Brophy* claim is to remedy harm *to the corporation*. *AIG*, 965 A.2d at 800; *Oracle*, 867 A.2d at 927; *Guttman*, 823 A.2d at 505.

> A *Brophy* claim is fundamentally derivative in nature, because it arises out of the misuse of corporate property—that is, confidential information—by a fiduciary of the corporation, for the benefit of the fiduciary and to the detriment of the corporation. The claim essentially arises out of agency law, which holds that an agent may not acquire a material benefit (other than from his principal) in connection with his position as agent.

*Latesco*, 2009 WL 2246793, at *6 (internal citations omitted). The *Brophy* claim thus belongs to the corporation, although it can be asserted derivatively by a stockholder.

Harm to the corporation is generally *not* measured by insider trading gains or reciprocal losses. The Delaware Supreme Court has held explicitly on two occasions that Delaware law does not provide a class-wide remedy for market-based harm. *Malone*, 722 A.2d at 12–14 (rejecting breach of fiduciary duty as vehicle for class-wide recovery of trading losses); *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 474 (Del.1992) (rejecting common law fraud claim as vehicle for class-wide recovery of trading losses). Interpreting *Brophy* as a basis for recovering those measures of damages would conflict with *Malone* and *Gaffin*.

Disgorgement of insider trading profits (or recovery of reciprocal trading losses) is also not the appropriate measure of damages because insiders who trade on an impersonal market typically are not engaging in the type of self-dealing transaction to which a disgorgement remedy historically applies. Vice Chancellor Strine explained these differences in *Guttman:*

> In this case, the plaintiffs attack a myriad of stock sales, not between the defendant-directors and [the corporation], but between the defendant-directors and marketplace buyers. As a matter of course, corporate insiders sell company stock and such sales, in themselves, are not quite as suspect as a self-dealing transaction in which the buyer and seller can be viewed as sitting at both sides of the negotiating table. Although insider sales are (rightly) policed by powerful forces—including the criminal laws—to prevent insiders from unfairly defrauding outsiders by trading on non-public information, it is unwise to formulate a common law rule that makes a director "interested" whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information.

823 A.2d at 502; *accord Oracle*, 867 A.2d at 927–34. Similarly, trading in the market typically does not involve the usurpation of a corporate opportunity, where disgorgement has been the preferred remedy. "Delaware courts have recognized a policy that allows officers and directors of corporations to buy and sell shares of that corporation at will so long as they act in good faith. A corporation generally has no interest in its outstanding stock or in dealing in its shares among its stockholders." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 973–74 (Del.Ch.2003), *aff'd*, 845 A.2d 1040 (Del. 2004) (internal citations and quotations omitted).

These principles do not mean that a disgorgement remedy is precluded. When a breach of the duty of loyalty has

been shown, disgorgement remains theoretically available. When a fiduciary engages directly in actual fraud and benefits from trading on the basis of the fraudulent information, disgorgement could be appropriate. *See Tucker v. Scrushy,* 2009 WL 1709245, at *1 (Ala. Cir.Ct. June 18, 2009) (ordering disgorgement where CEO actively participated in fraud). Disgorgement also would be appropriate if the insider used confidential corporate information to compete directly with the corporation. This was the case in the seminal *Brophy* decision itself, where the fiduciary bought shares based on inside information that the corporation was about to purchase a large block, thereby putting himself in direct conflict with the corporation in the market for the shares. 70 A.2d at 7; *see Triton Const. Co. v. Eastern Shore Elec. Servs.,* 2009 WL 1387115, at *11, *28–29 (Del.Ch. May 18, 2009) (finding breach of fiduciary duty under *Brophy* and ordering disgorgement where employee of private company used employer's confidential information to compete with employer).

In the typical scenario in which an insider trades based on material information that allegedly was not disclosed to stockholders, a corporation can recover for actual harm causally related (in both the actual and proximate sense) to the breach of the duty of loyalty. Without limiting the types of harm that could be related causally to a loyalty breach, the obvious candidates are costs and expenses for regulatory proceedings and internal investigations, fees paid to counsel and other professionals, fines paid to regulators, and judgments in litigation. *Cf. Thorpe v. CERBCO,* 676 A.2d 436, 445 (Del.1996) (requiring fiduciary to reimburse corporation for "any expenses, including legal and due diligence costs" resulting from the loyalty breach). The existence of a federal securities action for insider trading is highly likely to inflict monetary harm, because the corporation is typically named as a defendant in a federal insider trading case. *See SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 860–62 (2d Cir.1968) (holding that corporation is proper defendant), *cert denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Here, the Complaint specifically seeks to recover damages to the Company as a result of the companion federal securities action.

*AIG* illustrates the types of harms a corporation can suffer. As a result of the breaches of the duty of loyalty alleged to have taken place in that case, the corporation spent over $1.6 billion in fines and other payments to resolve lawsuits, enforcement actions, and regulatory proceedings. 965 A.2d at 793. Included in this amount were profits AIG was forced to disgorge and civil penalties relating to fraudulent transactions. Millions more were spent on legal fees, and, at the time of the decision, AIG was still facing ongoing lawsuits. *Id.* at 793–94.

In addition to *AIG,* while this matter was under submission, Vice Chancellor Noble issued his decision in *Deloitte.* 2009 WL 5200657, at *1. In that case, Deloitte alleged that one of its partners, Thomas Flanagan, profited by trading in the shares of Deloitte's clients on over 300 occasions using confidential information he learned as a partner of Deloitte. Deloitte pursued various claims against Flanagan, including for breach of the duty of loyalty. Deloitte claimed it had suffered "substantial damages," including "payment of compensation to Flanagan that Deloitte contends he waived the right to receive by virtue of his conduct." *Id.* at *7. In his December 29 opinion, Vice Chancellor Noble granted summary judgment in favor of Deloitte on the issue of liability, with further proceedings to take place on the issue of damages. Although arising in the context of a partnership rather than a corporation, and al-

though Vice Chancellor Noble did not cite *Brophy* in the opinion, *Deloitte* presented a straightforward *Brophy* claim on which this Court granted judgment as to liability and permitted the entity to recover its actual harm.[6]

Properly focusing on harm to the corporation disposes of the defendants' contentions that *Brophy* is a misguided vehicle for recovering the same trading losses that are addressed by the federal securities laws. This is not the purpose of a *Brophy* claim. It also disposes of the contention that *Brophy* grants a remedy without underlying harm. Again, it does not. Absent exceptional facts, *Brophy* remedies harm to the corporation.

**2. The Federal Insider Trading Regime Leaves Room For *Brophy*.**

Wearing the advocate's hat, defense counsel seeks to portray the federal insider trading regime as a pervasive and comprehensive system that "regulates extensively all forms of trading on non-public information." Def. Op. Br. at 7. The defendants then contend that this system leaves no room for *Brophy*. The actual nature of the federal regime differs from the defendants' portrayal, and I need not embrace any criticisms of the federal effort to conclude that it leaves ample space for a Delaware corporate remedy.

As a threshold matter, federal law does not establish a "comprehensive federal regime regulating insider trading." Def. Op. Br. at 14. The federal regime is a product of common law adjudication built by interpreting Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act")[7] and Rule 10b–5,[8] the principal regulation implementing Section 10(b). *See* Stephen M. Bainbridge, *Securities Law: Insider Trading* 24 (1999) (hereinafter "*Insider Trading*") ("The core of the modern federal insider trading prohibition derives its

---

**6.** The same law firm now leading the charge to overrule *Brophy* represented Deloitte. Deloitte's opening brief in support of its motion for partial summary judgment relied on *Brophy* for the proposition that: "It is also well-settled that insider trading is a breach of the duty of loyalty." Plaintiffs' Opening Memorandum in Support of their Motion for Summary Judgment at 28. Deloitte's opening brief also relied on *AIG*, both as establishing that insider trading constitutes a breach of fiduciary duty and for the elements of the claim. *Id.* The same law firm's opening brief in this case did not mention *AIG*, and, after the plaintiffs cited it in opposition, the defendants argued that *AIG* did not support the continuing vitality of *Brophy*.

**7.** Section 10 provides, in pertinent part:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any ma-

nipulative or deceptive device or contrivance in contravention of such rules and regulation as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j (2006).

**8.** Rule 10b–5 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5 (2006).

statutory authority from § 10(b) . . . .''); *id.* at 27 (describing Rule 10b–5 as ''the foundation on which the modern [federal] insider trading prohibition rests''). Neither Section 10(b) nor Rule 10b–5 actually mentions insiders or insider trading. *Id.* at 25, 28. The United States Supreme Court has described Rule 10b–5 as ''a judicial oak which has grown from little more than a legislative acorn.'' *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).[9] ''Nowhere in Rule 10b–5 jurisprudence is this truer than where the insider trading prohibition is concerned, given the tiny (even nonexistent) legislative acorn on which it rests.'' *Insider Trading* at 28–29.

As a judicial officer of a state that embraces the efficiency of broad enabling statutes, private ordering, and the development of the common law through the adjudication of specific cases, I do not criticize my federal counterparts for adopting a case-by-case approach. Nevertheless, the fact that the federal regime is itself largely a common law system takes some of the force out of the defendants' argument.

It is also not clear how pervasively and coherently the federal regime actually regulates insider trading. Many scholars have criticized it.[10] The United States Supreme Court has acknowledged that Rule 10b–5 is not comprehensive and leaves out logical plaintiffs. *Blue Chip Stamps,* 421 U.S. at 738, 95 S.Ct. 1917. Again, I intimate no criticism of the federal effort. I merely note that the defendants' description is overblown.

I similarly do not regard the availability of criminal sanctions for insider trading or regulatory enforcement through the SEC as indicating that a state law corporate remedy should no longer be available. The federal government's civil and criminal enforcement authority has existed in

**9.** *See Stoneridge Inv. Partners v. Scientific–Atlanta,* 552 U.S. 148, 150, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008) (''The § 10(b) private cause of action is a judicial construct that Congress did not enact in the text of the relevant statutes.''); *see also* S. Michael Sirkin, Comment, *The Deterrence Paradox: How Making Securities Fraud Class Actions More Difficult For Plaintiffs Will More Strongly Deter Corporate Fraud,* 82 Temp. L.Rev. 307, 310 (2009) (''Although Congress did not expressly provide a private civil remedy . . . in the governing statute, and the legislative history does not imply one, courts have inferred one from Rule 10b–5, with the tacit approval of Congress.'') (footnotes omitted).

**10.** *See, e.g.,* Richard A. Booth, *The Missing Link Between Insider Trading And Securities Fraud,* 2 J. Bus. & Tech. L. 185, 205–06 (2007) (arguing against existing class-based system under federal securities laws and in favor of derivative remedy); Saikrishna Prakash, *Our Dysfunctional Insider Trading Regime,* 99 Colum. L.Rev. 1491, 1491 (1999) (describing regime as ''astonishingly dysfunctional''); Donna M. Nagy, *Reframing the Misappropriation Theory of Insider Trading Liabil-* *ity: A Post–O'Hagan Suggestion,* 59 Ohio St. L.J. 1223, 1256–58 (1998) (criticizing ''brazen fiduciary'' exception in *United States v. O'Hagan,* 521 U.S. 642, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997)); Richard W. Painter, et al., *Don't Ask, Just Tell: Insider Trading After United States v. O'Hagan,* 84 Va. L.Rev. 153, 179 (1998) (describing as ''startling'' that *O'Hagan* ''permits a fiduciary to trade on material nonpublic information with the consent of the principal''); Randall W. Quinn, *Comment: The Misappropriation Theory of Insider Trading in the Supreme Court: A (Brief) Response To The (Many) Critics of United States v. O'Hagan,* 8 Fordham J. Corp. & Fin. L. 865 (2003) (identifying and discussing range of criticisms). I leave aside those scholars who argue that insider trading should be permitted. *See, e.g,* Henry Manne, *Insider Trading and the Stock Market* (1966) (arguing that insider trading promotes market efficiency and could be used as a compensation scheme); Alexander Padilla, *How Do We Think About Insider Trading? An Economist's Perspective On The Insider Trading Debate And Its Impact,* 4 J.L. Econ. & Pol'y 239 (2008) (surveying academic literature to evaluate the influence of Manne's arguments).

parallel with the private right of action under Rule 10b–5. The logical conclusion is that the existence of civil and criminal enforcement authority does not eliminate private rights of action, including causes of action under state law.

The defendants' position would be stronger had Congress actually sought at some point to implement an overarching regulatory scheme to govern insider trading. Their position would be much stronger had Congress acted, expressly or implicitly, to preclude a state law remedy. The history of Congressional action suggests the opposite.

As I have discussed in a recent case, the jurisdictional provisions of the Exchange Act do not preempt state law remedies. *NACCO Indus. v. Applica, Inc.,* —— A.2d ——, 2009 WL 4981577, at *16–17 (Del.Ch. Dec.22, 2009). Section 28(a) of the Exchange Act provides: "[T]he rights and remedies provided by [the Exchange Act] shall be in addition to any and all other rights and remedies that may exist at law or in equity. . . ." 15 U.S.C. § 78bb. Section 28(a) establishes that "the express intention of Congress was that the federal securities law would not dilute any remedies allowed by the states, either in law or equity." *Rossdeutscher v. Viacom, Inc.,* 768 A.2d 8, 17 (Del.2001). The federal remedies available under the Exchange Act were thus "intended to coexist with claims based on state law and not preempt them." *Id.*

Since the original adoption of the Exchange Act, Congress has twice addressed insider trading without altering the current regime. In 1984, Congress increased the penalties for insider trading. Insider Trading Sanctions Act of 1984, Pub.L. No. 98–376, 98 Stat. 1264 (codified at 15 U.S.C. § 78t). In 1988, Congress increased the penalties again. Insider Trading and Securities Fraud Enforcement Act of 1988,

Pub.L. No. 100–704, 102 Stat. 4677 (codified at 15 U.S.C. § 78u–1). Congress also added § 20A to the Exchange Act, creating an explicit private cause of action against any person who violates insider trading rules that can be brought by anyone who traded contemporaneously with the violator. *Id.* § 78t–1. Neither statute sought to preempt or eliminate a state law derivative remedy.

In 1995, Congress adopted the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Pub.L. No. 104–67, 109 Stat. 737 (codified at 15 U.S.C. § 78u–4). In 1998, Congress enacted the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"). Pub.L. No. 105–353, 112 Stat. 3227 (codified at 15 U.S.C. § 77z–1). SLUSA amended the Exchange Act to prevent plaintiffs from avoiding the PSLRA by filing class actions in state court and to require generally that all class actions involving the purchase or sale of securities traded on a national exchange be brought exclusively in federal court under federal law. SLUSA preserved and did not preempt an "exclusively derivative action brought by one or more shareholders on behalf of a corporation." 15 U.S.C. § 78bb(f)(5)(C). SLUSA also preserved and did not preempt state law class actions based on the fiduciary duty of disclosure owed by corporate directors to stockholders. 15 U.S.C. § 78bb(f)(3)(A).

Relying on this legislative history, the Delaware Supreme Court has held that a corporation can pursue a cause of action for breach of fiduciary duty against officers and directors who "deliberately misinform[ ] shareholders about the business of the corporation, either directly or by a public statement." *Malone,* 722 A.2d at 14. A corporate claim of this type may be pursued derivatively. *Id.* There are strong similarities between a corporate claim for breach of fiduciary duty under

*Malone* and a corporate claim for insider trading under *Brophy*. Both implicate the duty of loyalty. Both seek to police the informational disparities created by the separation of ownership from control. Both address misuse of corporate information. Both can be asserted derivatively. Facts supporting both have been pled here.

Just as the federal securities laws leave room for *Malone,* so too they leave room for *Brophy*. Indeed, when interpreting the federal securities laws, the United States Supreme Court has noted and assumed the existence of a *Brophy* claim. *See Blue Chip Stamps,* 421 U.S. at 739 n. 9, 95 S.Ct. 1917 (noting that disadvantages of limiting federal cause of action to purchasers and sellers of securities were mitigated by "remedies are available to non-purchasers and nonsellers under state law"); *cf. Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* 547 U.S. 71, 87, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006) (holding that SLUSA preempted class actions by non-traders but that SLUSA preserved "derivative actions brought by shareholders on behalf of a corporation"). As I discuss in the next section, the federal insider trading regime as developed by the United States Supreme Court is largely premised on the existence of a state law fiduciary duty implicated by insider trading. The case for continuing to recognize a corporate claim under *Brophy* is thus stronger than it was for *Malone.*

I therefore reject the defendants' contention that the federal government has so pervasively regulated insider trading as to crowd out a state law corporate remedy. The history and nature of the federal regime rather supports the conclusion that a breach of fiduciary duty claim for harm to the corporation is preserved.

### 3. The Federal Insider Trading Regime Currently Depends On State Law Fiduciary Duties.

As I indicated in the prior section, the defendants' attack on *Brophy* fails to address a critical underpinning of the federal approach to insider trading: It depends on the existence of a fiduciary relationship or similar relationship of trust and confidence. Federal law does not give rise to or establish the fiduciary duties of directors or officers. Those matters are governed by state law. Thus the federal insider trading regime as currently structured rests on a foundation of state law fiduciary duties. If Delaware were to hold that the fiduciary duties of directors and officers did not limit their insider trading, the cornerstone of the federal system would be removed.

A brief survey of landmark federal cases on insider trading shows the system's dependence on an underlying fiduciary relationship. In *Texas Gulf Sulphur,* the United States Court of Appeals for the Second Circuit embraced an expansive interpretation of Rule 10b–5 that sought to ensure that "all investors trading on impersonal exchanges have relatively equal access to material information." 401 F.2d at 848. Under the *Texas Gulf Sulphur* approach, "anyone in possession of material inside information" was obligated to disclose the information or abstain from trading. *Id.* The prohibition on trading extended to anyone who had "access, directly or indirectly" to confidential information that the individual knew was unavailable to the investing public. *Id. See generally Insider Trading* at 42–48 (discussing *Texas Gulf Sulphur* ).

The United States Supreme Court first addressed the broad *Texas Gulf Sulphur* approach in *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). Vincent Chiarella was an employ-

ee of a printing company that prepared tender offer materials. Through his access to those materials, Chiarella learned about forthcoming bids and purchased shares in the target companies before the bids were announced. He was convicted of violating Rule 10b–5 by trading on inside information under the equal-access-to-information approach established by *Texas Gulf Sulphur*. Chiarella asked the United States Supreme Court to set aside his conviction, arguing that he was not an employee, officer, or director of any of the companies in whose stock he traded. Under *Texas Gulf Sulphur*, Chiarella's status would not have mattered, because he possessed and traded on insider information to which other market participants did not have access.

The United States Supreme Court, however, rejected the *Texas Gulf Sulphur* approach. The Supreme Court instead held that that a duty to disclose "arises when one party has information 'that the other party is entitled to know because of a fiduciary or other similar relation of trust or confidence between them.'" *Chiarella*, 445 U.S. at 228, 100 S.Ct. 1108 (quoting Restatement (Second) of Torts § 551(2)(a) (1976)). Citing *Brophy*, as well as other authorities, the Chiarella Court recognized that one such relationship giving rise to a duty of disclosure is the "relationship of trust and confidence between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation." *Id.* at 228, 100 S.Ct. 1108. The Chiarella Court similarly interpreted two of its precedents as depending "upon the fiduciary duty between the corporate insider and the shareholder." *Id.* at 228 n. 10, 100 S.Ct. 1108 (citing *Pepper v. Litton,* 308 U.S. 295, 307 n. 15, 60 S.Ct. 238, 84 L.Ed. 281 (1939) and *Strong v. Repide,* 213 U.S. 419, 431–34, 29 S.Ct. 521, 53 L.Ed. 853 (1909)). The Chiarella Court concluded

that liability under Section 10(b) and Rule 10b–5 "is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction." *Id.* at 230, 100 S.Ct. 1108. Chiarella's conviction was vacated because he owed no duty to the parties from whom he purchased securities. "He was not their agent, he was not a fiduciary, he was not a person in whom the sellers had placed their trust and confidence." *Id.* at 232, 100 S.Ct. 1108. In passing, the Supreme Court linked tippee liability to the existence of an underlying fiduciary relationship, explaining that the obligation of a tippee not to trade on inside information "aris[es] from his role as a participant after the fact in the insider's breach of a fiduciary duty." *Id.* at 230 n. 12, 100 S.Ct. 1108.

Three years after *Chiarella*, the United States Supreme Court reinforced this approach in *Dirks v. SEC,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). The Court reaffirmed the requirement of an underlying fiduciary relationship, stating:

> We were explicit in *Chiarella* in saying that there can be no duty to disclose where the person who has traded on inside information was not the corporation's agent, was not a fiduciary, or was not a person in whom the sellers of the securities had placed their trust and confidence. Not to require such a fiduciary relationship, we recognized, would depart radically from the established doctrine that duty arises from a specific relationship between two parties and would amount to recognizing a general duty between all participants in market transactions to forgo actions based on material, nonpublic information.

*Id.* at 654–55, 103 S.Ct. 3255 (internal citations and quotations omitted). *Dirks* was a tippee case, and the Supreme Court elevated to a holding the *dictum* from *Chiar-*

*ella* that a tippee's duty not to trade derives from the fiduciary duties owed by the insider who provides the tip. *Id.* at 659–60, 103 S.Ct. 3255. The Court held that "a tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach." *Id.* at 660, 103 S.Ct. 3255.

The necessity of an underlying fiduciary relationship was again reaffirmed in *O'Hagan.* There, the United States Supreme Court recognized the misappropriation theory of insider trading, while at the same time reaffirming the classical theory of insider trading. The latter, as recognized in *Chiarella,* applies when a fiduciary trades with the beneficiary without disclosing material information and therefore in breach of the underlying fiduciary relationship. *O'Hagan,* 521 U.S. at 652, 117 S.Ct. 2199 ("Trading on [inside] information qualifies as a 'deceptive device' under § 10(b), we have affirmed, because 'a relationship of trust and confidence exists between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation.'" (quoting *Chiarella* )). The former applies when "a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information." *Id.* Both theories thus rest on an underlying fiduciary relationship. Interestingly, and consistent with the continuing validity of *Brophy,* the O'Hagan Court recognized that the source of the misappropriated information may have state law claims against the misappropriator. 521 U.S. at 655, 117 S.Ct. 2199 ("[T]he fiducia-

ry-turned-trader may remain liable under state law for breach of a duty of loyalty.").

As these landmark decisions show, the United States Supreme Court has "consistently held that insider trading liability requires an agency or fiduciary relationship." *Insider Trading* at 92. The fiduciary duties owed by directors and officers of a state-chartered corporation are created and governed by state law. *Kamen v. Kemper Fin. Servs.,* 500 U.S. 90, 98–99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991); *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 91, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987); *Edgar v. MITE Corp.,* 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982); *Burks v. Lasker,* 441 U.S. 471, 486, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979); *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 477–80, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *VantagePoint Venture Partners v. Examen, Inc.,* 871 A.2d 1108, 1112–18 (Del.2005).

I cannot foresee what might happen were a Delaware court to hold, as the defendants ask, that insiders do not breach any fiduciary duty to the corporation they owe by engaging in insider trading. Such a holding would take insider trading outside the fiduciary relationship of trust and confidence that has formed the basis for the federal approach since *Chiarella.* Arguably the private right of action for insider trading under Rule 10b–5, which depends on a breach of fiduciary duty, would no longer function. *See* Booth, *supra,* at 196 ("[F]ederal law depends on state law in this context. If there is no violation of state law, there is no violation of federal law."). Although I cannot predict the consequences of such a step, it is clear to me that it would be inconsistent with how the federal law of insider trading has developed. Contrary to the defendants' argument, maintaining *Brophy* is consistent with federal law. Overruling *Brophy*

would fly in the face of the federal approach.

### 4. *Brophy* Serves Important Delaware Public Policies And Is Aligned With Federal Law.

The duty of loyalty has paramount importance under Delaware law. Delaware's consistent corporate philosophy has been to grant deference to boards in exercising their authority to direct and oversee the business and affairs of the corporation, balanced by assiduous protection of the stockholders' right to elect new directors and meaningful enforcement of fiduciary duties, with particular emphasis on the duty of loyalty. Section 102(b)(7) embodies this policy by precluding a certificate of incorporation from purporting to eliminate or limit the personal liability of a director "[f]or any breach of the director's duty of loyalty to the corporation or its stockholders," "for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law," or "for any transaction from which the director derived an improper personal benefit." 8 Del C. § 102(b)(7). Indemnification is similarly barred unless the individual "acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation." *Id.* at §§ 145(a) & (b). Our case law has consistently stressed the importance of the duty of loyalty.[11]

Maintaining *Brophy* as a cause of action fulfills Delaware's strong public policy of policing against loyalty violations by fiduciaries. It serves to protect the corporation's interest in its confidential information and to ensure that the information is not misused for private gain. *Latesco,* 2009 WL 2246793, at *6. Eliminating the remedy would be equivalent to transferring ownership of information from the corporation to its fiduciaries, which is contrary to Delaware law.

Delaware is of course mindful of the fact that our national and state governments share jurisdiction over corporations. As Vice Chancellor Strine has explained:

> This State's derivative remedy for insider trading by fiduciaries presents an obvious potential for regulatory conflict between state courts and the federal enforcement regime, which notably includes the potential for criminal penalties. Our courts have thus been sensitive to the need for effective—i.e., rigorous, but also efficient, in the sense of being proportionate and non-duplicative—enforcement of the important public policy that prevents corporate insiders from exploiting material, non-public information to make trading profits.

*Guttman,* 823 A.2d at 505 n. 28.

Contrary to the defendants' assertions, the standards applied under *Brophy* do not

---

11. *See, e.g., Stone v. Ritter,* 911 A.2d 362, 370 (Del.2006) (describing the directors' duty of loyalty as an onerous one); *Venhill Ltd. ex rel. Stallkamp v. Hillman,* 2008 WL 2270488, at *30 n. 104 (Del.Ch. June 3, 2008) (noting that the duty of loyalty rests "upon a broader foundation of a wise public policy that, for purposes of removing all temptation, extinguishes all possibility of profit flowing from the breach of confidence imposed by the fiduciary relation"); *In re Primedia Inc. Deriv. Litig.,* 910 A.2d 248, 262 (Del.Ch.2006) ("Concerns of equity and deterrence justify loosen-

ing normally stringent requirements of causation and damages when a breach of the duty of loyalty is shown.") (internal citations omitted); *Technicorp Int'l II, Inc. v. Johnston,* 2000 WL 713750, at *5 (Del.Ch. May 31, 2000) ("[T]he duty of loyalty of a director [imposes] a special obligation upon a director in any of his relationships with the corporation."); *Boyer v. Wilmington Materials, Inc.,* 754 A.2d 881, 906 (Del.Ch.1999) (discussing the "strict imposition of penalties under Delaware law ... designed to discourage disloyalty").

conflict with the federal securities laws. "Delaware case law makes the same policy judgment as federal law does, which is that insider trading claims depend importantly on proof that the selling defendants acted with *scienter.*" *Guttman,* 823 A.2d at 505. The elements of a *Brophy* claim similarly "more or less track the key requirements to recover against an insider under federal law." *Oracle,* 867 A.2d at 934. I thus conclude that the "reasoned application" of *Brophy* that was articulated in *AIG, Oracle,* and *Guttman* is "not out of step with federal law." *Oracle,* 867 A.2d at 929, 932. I decline the defendants' invitation to reject *Brophy.*

### E. The Contribution And Indemnification Claim Can Proceed.

In far more abbreviated fashion, the defendants ask me to dismiss Count II of the Complaint, which asserts a claim for indemnification and contribution on behalf of Toll Brothers against the defendants. The argument that such a claim is not ripe was addressed and disposed of in *AIG* for reasons I need not repeat here. 965 A.2d at 801–03. I follow *AIG* and treat the claim as ripe.

The defendants' argument that provisions of the federal securities laws necessarily will control any right of indemnification and bar any right of contribution is not something I will determine at this stage of the proceeding. It is certainly possible that settlements or judgments in the federal action could bar a state law indemnification or contribution claim. *See, e.g., In re HealthSouth Corp. Sec. Litig.,* 572 F.3d 854 (11th Cir.2009) (describing effect of federal settlement by issuer containing reciprocal bar order precluding certain indemnification and contribution actions). But, as in *AIG,* it is not clear at this stage of the case why Toll Brothers might not be entitled to indemnification or

contribution for some aspect of the harm the defendants have caused. Any specific limits on potential indemnification or contribution can and will be addressed once the nature of the potential liability is more clear. *AIG,* 965 A.2d at 802.

### F. The Parties Will Confer Regarding Further Proceedings.

Although I have denied the defendants' motion to dismiss, I do not believe that this case should proceed with full-blown merits discovery, and certainly not in a manner that is duplicative of the Federal Securities Action. It would be counterintuitive if an action such as this one, which exists to recover for harm imposed on the corporation, was permitted to proceed in a way that increased the burden on the corporation. At a minimum, sensible coordination with the Federal Securities Action is warranted. A stay of this action pending the litigation of the Federal Securities Action also could make sense. Rather than deciding this issue without input from the parties, I direct that they confer on how to approach this case prudently in light of its purpose. If the parties cannot agree on a fitting solution, the defendants should take the lead in seeking my assistance by filing an appropriate motion, to which the plaintiff may respond.

### III. CONCLUSION

For the foregoing reasons, I deny the defendants' motions to dismiss. **IT IS SO ORDERED.**