# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THOMAS SANDYS, Derivatively on Behalf of ZYNGA INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 9512-CB |
| | ) | |
| MARK J. PINCUS, REGINALD D. DAVIS, CADIR B. LEE, JOHN SCHAPPERT, DAVID M. WEHNER, MARK VRANESH, WILLIAM GORDON, REID HOFFMAN, JEFFREY KATZENBERG, STANLEY J. MERESMAN, SUNIL PAUL and OWEN VAN NATTA, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ZYNGA INC., a Delaware Corporation, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  November 17, 2015
Date Decided:  February 29, 2016

Norman M. Monhait and P. Bradford deLeeuw, ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; Jeffrey S. Abraham and Philip T. Taylor, ABRAHAM, FRUCHTER & TWERSKY, LLP, New York, New York; *Attorneys for Plaintiff*.

Elena C. Norman, Nicholas J. Rohrer and Paul J. Loughman, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Jordan Eth, Anna Erickson White and Kevin A. Calia, MORRISON & FOERSTER LLP, San Francisco, California; *Attorneys for Defendant*s Mark J. Pincus, Reginald D. Davis, Cadir B. Lee, John Schappert, David M. Wehner, Mark Vranesh, Owen Van Natta, and Nominal Defendant Zynga Inc.

Bradley D. Sorrels and Jessica A. Montellese, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; Steven M. Schatz, Nina Locker and Benjamin M. Crosson, WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California; *Attorneys for Defendants* William Gordon, Reid Hoffman, Jeffrey Katzenberg, Stanley J. Meresman and Sunil Paul.

**BOUCHARD, C.**

A stockholder of Zynga Inc. brings this derivative suit to recover damages the company allegedly suffered because the Zynga board approved exceptions to lockup agreements and other trading restrictions that allowed certain directors and officers to sell some of their Zynga shares in an April 2012 secondary offering. Shortly after the secondary offering, Zynga's share price fell dramatically. Plaintiff's central grievance is that fiduciaries of the company sold shares in the secondary offering when they knew the company's performance was suffering and decided to cash out before the market was made aware.

Plaintiff filed this suit in April 2014 asserting three claims. Count I asserts that certain directors and officers who sold shares in the secondary offering misused confidential internal information concerning the company's deteriorating performance. Count II asserts that the board breached its duty of loyalty by approving the secondary offering, causing the company to suffer reputational harm and exposing it to liability in other lawsuits arising out of these events. Count III asserts that the board and certain officers injured the company by failing to implement controls to ensure that Zynga would timely report material changes to its financial condition and by failing to disclose such information.

Defendants moved to stay this case in favor of other then-pending actions, or to dismiss it due to plaintiff's failure to make a pre-suit litigation demand and for failure to state a claim for relief. For the reasons explained below, the action will be dismissed because of plaintiff's failure to demonstrate that making a demand would have been futile.

1

Significant to the demand futility analysis here, the composition of Zynga's board underwent important changes between approval of the secondary offering and the filing of the complaint. As I explained in a related case, at least half of the Zynga directors who approved the challenged transaction sold some of their Zynga shares in the secondary offering and may have received an unfair personal benefit as a result.[1] But by the time this action was filed, two of the directors who sold shares in the secondary offering had left the board and had been replaced by two outside directors who had no involvement in the underlying events.

Delaware law entrusts a board comprised of an independent, disinterested majority of directors with the power to decide whether it is in the corporation's best interests to pursue claims on its behalf, including claims against fellow directors and officers. Thus, before a stockholder may assert such claims derivatively on the corporation's behalf, the stockholder either must make a pre-suit demand on the board or demonstrate why it would be futile to do so. To demonstrate demand futility, a plaintiff must plead particularized facts demonstrating that the board in place when suit was filed could not have made an impartial decision about whether or not to pursue the corporation's claims. Focusing on that time frame, plaintiff's complaint fails to plead particularized facts casting reasonable doubt on that board's ability to decide impartially whether it would be in Zynga's best interests to pursue the claims asserted in this case. Thus, plaintiff has failed to establish demand futility, and this action will be dismissed.

---

[1] *See Lee v. Pincus*, 2014 WL 6066108 (Del. Ch. Nov. 14, 2014).

2

## I.  BACKGROUND

Unless noted otherwise, the facts recited in this opinion come from the allegations in plaintiff's Verified Shareholder Derivative Complaint (the "Complaint") and certain corporate filings integral to the Complaint.[2]  Facts regarding the circumstances of board members are recited as of the date the Complaint was filed, the relevant point in time for assessing demand futility.[3]

### A. The Parties

Nominal defendant Zynga Inc. is a Delaware corporation headquartered in California.  Zynga develops and markets social games such as *FarmVille* and *Words with Friends*, primarily through the gaming platform of Facebook, Inc.  Plaintiff Thomas Sandys owns 400 shares of Zynga Class A common stock, which he acquired on February 3, 2012.  He has been a Zynga stockholder at all relevant times.

The Complaint names twelve individuals as defendants.  Eight of the individual defendants were members of Zynga's board at the time of the April 2012 secondary offering (the "Secondary Offering").  Three of those board members were also members of management:  Mark J. Pincus, Zynga's founder and Chief Executive Officer from 2007 to 2013; John Schappert, Zynga's Chief Operating Officer from May 2011 to August 2012; and Owen Van Natta, Zynga's Executive Vice President and Chief Business Officer from August 2010 to November 2011.  The other five board members

---

[2] *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69-70 (Del. 1995).

[3] *Rales v. Blasband*, 634 A.2d 927, 933-34 (Del. 1993) (noting that circumstances of "the board that would be considering the demand" determine demand futility analysis).

3

were outside directors: William Gordon, Reid Hoffman, Jeffrey Katzenberg, Stanley J. Meresman and Sunil Paul. I refer to these eight directors together as the "Secondary Offering Board."

Four of the members of the Secondary Offering Board sold stock in the Secondary Offering: Pincus, Schappert, Van Natta, and Hoffman. Pincus alone personally received $198 million in gross proceeds for shares he sold in the Secondary Offering. Through his ownership of enhanced voting Class B and Class C common stock, Pincus controls approximately 61% of the total voting power in Zynga.

The other four individuals named as defendants (Reginald D. Davis, Cadir B. Lee, Mark Vranesh, and David M. Wehner) served in various executive positions at Zynga during time periods relevant to this case. Each of them sold shares of Zynga stock in the Secondary Offering. I refer to these four individuals and the four directors who sold shares in the Secondary Offering (Pincus, Hoffman, Schappert, and Van Natta) collectively as the "Secondary Offering Participants."

As of the date of the Complaint, two members of the Secondary Offering Board (Schappert and Van Natta) had left and three new persons had joined the board: John Doerr, Ellen Siminoff, and Don Mattrick. Mattrick was serving both as a director and as the Chief Executive Officer of Zynga at the time this action was filed.

4

The table below summarizes the composition of Zynga's board of directors when the Secondary Offering was approved and when demand was made on the board in conjunction with the filing of the Complaint (the "Demand Board"): [4]

| Secondary Offering Board | Demand Board | Sold Shares in Secondary Offering |
|---|---|---|
| Schappert | | ✓ |
| Van Natta | | ✓ |
| Gordon | Gordon | |
| Hoffman | Hoffman | ✓ |
| Katzenberg | Katzenberg | |
| Meresman | Meresman | |
| Paul | Paul | |
| Pincus | Pincus | ✓ |
| | Mattrick | |
| | Doerr | |
| | Siminoff | |

## B. The IPO and the Lock-Ups

On December 16, 2011, Zynga sold shares of Class A common stock in its initial public offering (the "IPO"). Zynga and its directors, officers, and various employees entered into lock-up agreements (the "Lock-Ups") with the underwriters of the IPO that prohibited them from selling shares of Zynga stock for up to 165 days following the IPO. The original expiration date of the Lock-Ups was May 28, 2012.

---

[4] Hoffman, Meresman, Katzenberg, and Mattrick were members of Zynga's board when the Complaint was filed, but they have since left the board.

On March 7, 2012, Zynga's board met to discuss the Secondary Offering, through which certain stockholders would be permitted to sell shares before the expiration of the Lock-Ups. In that meeting, the board approved the Secondary Offering, including the sales of some of the shares held by director defendants Hoffman, Pincus, Schappert, and Van Natta. These four directors comprised a majority of the board members who approved the Secondary Offering because one member of Zynga's then eight-member board (Sunil Paul) was absent.

On March 13, the Audit Committee of the board approved exceptions to the trading window restrictions in Zynga's 10b5-1 trading plan to allow the Secondary Offering Participants to sell shares in the Secondary Offering. The next day, Zynga announced the Secondary Offering through a Registration Statement on Form S-1.

On March 26, Zynga announced that the underwriters for the IPO, Morgan Stanley & Co. LLC and Goldman, Sachs & Co., had agreed to the release of the Lock-Ups in connection with the Secondary Offering. On March 28, the board's pricing committee approved a Secondary Offering price of $12 per share. The full board did not meet to ratify the authority of the pricing committee until April 18, after the Secondary Offering had taken place.

On March 29, 2012, Zynga filed a prospectus regarding the Secondary Offering (the "Prospectus"), which included the company's historical operating financial metrics. The Prospectus did not disclose recent trends in certain operating metrics, which plaintiff alleges had begun worsening. For instance, average bookings per user ("ABPU"), a key

6

operating metric, had begun falling.[5] Daily average users ("DAU"), a figure reported on a daily basis to members of Zynga management including Pincus, Schappert, Wehner, and Van Natta, also had leveled off in the first quarter of 2012.[6] The Prospectus discussed the risk associated with Zynga's reliance on Facebook for revenue through the placement of Zynga products in Facebook's news feed, but did not discuss upcoming changes to Facebook's news feed algorithm that would become effective around April 2, 2012, which would negatively impact Zynga's performance.

On or about April 3, 2012, Zynga announced that the Secondary Offering had been completed. The Secondary Offering Participants sold a total of about 20 million shares for about $236 million, out of a total of about 49 million shares that were sold for approximately $515 million in the entire Secondary Offering.[7] Zynga's current non-executive employees were not able to participate in the Secondary Offering because they were not exempted from Zynga's trading window restrictions, which disallowed stock sales until three days after an earnings announcement. Zynga's former employees were not able to participate because they were not exempted from the Lock-Ups.

---

[5] Compl. ¶ 69.

[6] Compl. ¶¶ 75-76.

[7] Certain venture capital investors made some of the remaining sales. Compl. ¶ 113.

**C. Zynga's Stock Price Falls Significantly After the Secondary Offering**

On April 26, 2012, Zynga announced its earnings for the first quarter of 2012, which ended on March 31, 2012. These earnings reflected a 9.8% decline in APBU. On April 27, the market price of Zynga's shares declined by 9.6% to close at $8.52 per share.

Over the following months, negative trends in Zynga's financials continued. ABPU fell 16% further in the second quarter of 2012. After the announcement of those results, Zynga's stock closed at $3.18 per share, down 37% from the previous day's close of $5.08 per share.

On October 4, 2012, Zynga announced another set of earnings and lowered its full-year 2012 outlook. The company also announced an impairment charge of between $75 million and $85 million regarding the assets of OMGPOP, Inc., another game maker that Zynga had acquired in March 2012. By October 5, 2012, Zynga's stock price had fallen to $2.29 per share, a decrease of 81% from the $12 per-share price of the Secondary Offering.

**D. Related Litigation Challenging the Secondary Offering.**

In the wake of the rapid decline in Zynga's stock price after the Secondary Offering, several litigations were filed before this action commenced in April 2014.

On July 30, 2012, an action was filed in the United States District Court for the Northern District of California asserting claims under Section 10(b) of the Securities Exchange Act.[8] This action was later consolidated with several other suits. None of

---

[8] Compl. ¶ 117(d); Class Action Complaint for Violations of the Federal Securities Laws, *DeStefano v. Zynga, Inc.*, Case No. 12-CV-4007 (JSW) (N.D. Cal. July 30, 2012).

Zynga's outside directors was named as a defendant in the consolidated action, as amended.[9]  A final settlement was recently approved in that case.[10]

On August 1, 2012, a class action captioned *Reyes v. Zynga* was filed in a California state court asserting claims against the Secondary Offering Board under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.[11]  When plaintiff filed his case here, *Reyes* already had survived a demurrer for lack of subject matter jurisdiction.[12] In February 2015, the *Reyes* action was voluntarily dismissed with prejudice.[13]

On April 4, 2013, a former Zynga employee filed an action in this Court captioned *Lee v. Pincus*, C.A. No. 8458-CB, on behalf of a class of current and former Zynga employees who were not permitted to sell their shares in the Secondary Offering or for a certain period thereafter because they were not exempted from the Lock-Ups or the trading window restrictions (the "Delaware Class Action").  The Delaware Class Action named the Secondary Offering Board as defendants, along with Zynga, Goldman Sachs,

---

[9] *See* First Amended Complaint for Violation of Federal Securities Laws, *In re Zynga Inc. Sec. Litig.*, Lead Case No. 12–CV-4007 (JSW) (N.D. Cal. Mar. 31, 2014).

[10] *See* Order Granting Motion for Final Approval of Class Action Settlement and Motion for Attorneys' Fees, *DeStefano v. Zynga, Inc.*, 2016 WL 537946 (N.D. Cal. Feb. 11, 2016) (approving settlement providing for creation of a $23 million settlement fund).

[11] *Reyes v. Zynga, Inc.*, Case No. CGC-12-522876 (Cal. Super. Ct. Aug. 1, 2012).

[12] *See* Order Overruling Defendants' Demurrers to Plaintiff's Amended Complaint on the Ground That the Court Lacks Subject Matter Jurisdiction, *Reyes*, Case No. CGC-12-522876 (Cal. Super. Ct. Aug. 26, 2013).  The case later survived a demurrer for failure to state a claim.  *See* Order Overruling Defendants' Demurrer to Plaintiff's Amended Complaint, *Reyes*, Case No. CGC-12-522876 (Cal. Super. Ct. Sept. 29, 2014).

[13] Tr. Oral Arg. 7 (Nov. 17, 2015).

and Morgan Stanley. The primary claim asserted in that action was for breach of fiduciary duty against the Secondary Offering Board for approving the Secondary Offering on the theory that four of its members who sold some of their shares in the Secondary Offering before Zynga's stock price declined significantly had received an unfair benefit to the detriment of the class members. I concluded that the plaintiff had stated a direct claim for relief on November 14, 2014,[14] and later certified the class.[15]

### E. Procedural Posture

On April 4, 2014, after obtaining books and records regarding the Secondary Offering under 8 *Del. C.* § 220, plaintiff filed the Complaint in this action. It asserts three derivative claims on behalf of Zynga, which is named as a nominal defendant:

- Count I asserts a *Brophy*[16] claim against the Secondary Offering Participants, alleging that they breached their fiduciary duties by misusing Zynga's confidential information when they sold shares in the Secondary Offering while in possession of materially adverse, non-public information about the company.

- Count II asserts a claim for breach of the duty of loyalty against the Secondary Offering Board for approving the Secondary Offering and against the Audit

---

[14] *See Lee v. Pincus*, 2014 WL 6066108, *5-7, *13 (Del. Ch. Nov. 14, 2014).

[15] *Lee v. Pincus*, Order Granting Plaintiff's Motion for Class Certification, 2015 WL 9490433 (Del. Ch. Dec. 30, 2015) (ORDER).

[16] *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949).

Committee members for exempting the Secondary Offering Participants from trading restrictions to allow them to sell in the Secondary Offering.

- Count III asserts a *Caremark*[17] claim against all defendants, alleging that they breached their fiduciary duties by failing to put controls in place to ensure that Zynga made adequate public disclosures and avoided material omissions in its public statements.

On December 9, 2014, after the case had been stayed voluntarily by the parties for over eight months, defendants filed a motion (1) to stay this case in favor of the securities class actions pending in state and federal courts in California, and (2) to dismiss this case under Court of Chancery Rule 23.1 for failure to make a pre-suit litigation demand, and under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. Briefing was not completed until May 2015, and argument was heard on November 17, 2015.

## II. LEGAL ANALYSIS

Plaintiff brings all of his claims derivatively on behalf of Zynga under Court of Chancery Rule 23.1, alleging that each of them has caused harm to Zynga.[18] Defendants do not dispute that the claims are derivative in nature.

The *Brophy* and *Caremark* claims (Counts I and III) are derivative because any harm stemming from the misuse of Zynga's confidential information or from oversight failures that allowed Zynga to make material misstatements or violate laws accrues to

---

[17] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).

[18] Compl. ¶¶ 118, 123, 128, 134.

11

Zynga itself and to its stockholders only indirectly.[19] Although the theory of liability for Count II tracks the fiduciary duty claim asserted directly in the Delaware Class Action, the relief sought in this action is different. As I read the Complaint, plaintiff here seeks to recover for reputational harm to Zynga and for any liability it may incur in the federal securities class action and the Delaware Class Action.[20] Accordingly, I will analyze each of the claims as being derivative. Because I conclude that demand was not excused for each of the claims thus necessitating dismissal of the Complaint, I do not address any of defendants' other arguments for a stay or dismissal of this case.

## A.    Demand Futility Standard

Under Court of Chancery Rule 23.1, a derivative plaintiff's complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[21] This rule is the procedural embodiment of the substantive requirement that a plaintiff must either make a

---

[19] *See Latesco, L.P. v. Wayport, Inc.*, 2009 WL 2246793, at *6 (Del. Ch. July 24, 2009) ("A *Brophy* claim is fundamentally derivative in nature, because it arises out of the misuse of corporate property—that is, confidential information—by a fiduciary of the corporation, for the benefit of the fiduciary and to the detriment of the corporation."); *Stone v. Ritter*, 911 A.2d 362, 365 (Del. 2006) (applying *Caremark* standard to derivative oversight claims); *see also Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) (holding that whether claim is direct or derivative turns solely on who suffered the alleged harm and who would receive the benefit of any recovery).

[20] *See* Compl. ¶ 118.

[21] Ct. Ch. R. 23.1(a).

12

demand upon the board to initiate the litigation or demonstrate that such a demand would be futile.[22]

To determine whether a plaintiff's demand upon the board would be futile, Delaware courts employ one of two tests. The first, articulated in *Aronson v. Lewis*, requires the plaintiff to plead facts that create a reasonable doubt either that "the directors are disinterested and independent" or that "the challenged transaction was otherwise the product of a valid exercise of business judgment."[23] The *Aronson* test does not apply when "the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit."[24] For instance, it will not apply when the board did not undertake a business decision or when a majority of the members that made the challenged decision have been replaced.[25] In such situations, this Court instead applies the *Rales* test, under which plaintiff must create a reasonable doubt that "the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand" at the time the complaint was filed.[26]

---

[22] *See In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *32-33 (Del. Ch. Jan. 25, 2016).

[23] *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984).

[24] *Rales v. Blasband*, 634 A.2d 927, 933-34 (Del. 1993).

[25] *Id.*

[26] *Id.* at 934.

13

Demand futility is assessed claim by claim.[27] I will now address each of plaintiff's claims, addressing at the outset whether to apply the *Aronson* or *Rales* test to each claim.

## B. Demand Is Not Excused for the *Brophy* Claim

Count I asserts a *Brophy* claim against the Secondary Offering Participants based on their alleged misuse of Zynga's confidential information to sell their shares in the Secondary Offering. Four of these defendants (Hoffman, Pincus, Schappert, and Van Natta) were directors at the time of the Secondary Offering, but their decision to sell shares was an individual choice, not a decision of the board.[28] Consequently, Count I does not challenge a business decision of the board, and the *Rales* test applies.

Under the *Rales* test, I must determine if plaintiff has created a reasonable doubt as to whether Zynga's board of directors at the time this case was filed was able to properly exercise its independent and disinterested business judgment in responding to a demand to file suit. To do so, plaintiff must create a reasonable doubt that at least five of the nine directors on the Demand Board were disinterested and independent. Conversely, if there are five directors on the Demand Board for whom plaintiff does not create such a

---

[27] *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *18 (Del. Ch. May 5, 2010) ("Demand futility must be determined on a claim-by-claim basis.").

[28] *See In re Career Educ. Corp. Deriv. Litig.*, 2007 WL 2875203, at *12 (Del. Ch. Sept. 28, 2007) ("Plaintiffs challenge insider stock sales made by various directors. Because this is not a specific action taken by the entire board, *Rales* is the proper standard."); *Zimmerman v. Braddock*, 2005 WL 2266566, at *6 (Del. Ch. Sept. 8, 2005) ("[S]ince the alleged insider trading was not an affirmative action of the [board], demand futility is evaluated under the *Rales* standard . . . ."), *rev'd on other grounds*, 906 A.2d 776 (Del. 2006).

14

reasonable doubt, then plaintiff fails to meet his burden under Rule 23.1 of establishing that demand would be futile.

For purposes of this test, an "interested" director is one who receives from a corporate transaction a personal benefit not equally shared by the stockholders, such that he or she could face liability if the transaction were subjected to entire fairness scrutiny.[29] Under *Rales*, a director who faces a substantial likelihood of personal liability also is unable to consider demand impartially.[30]

Count I challenges the Secondary Offering Participants' sale of shares in the Secondary Offering. Because Hoffman and Pincus are the only members of the Demand Board who sold shares in the Secondary Offering and received a benefit from the alleged wrongdoing, they are the only members of the Demand Board who face potential liability under *Brophy*. Consequently, the other seven directors on the Demand Board are not interested in Count I for purposes of the *Rales* test,[31] and I need only to determine whether plaintiff has created a reasonable doubt about their independence.

A director lacks independence for purposes of determining demand futility when he or she is sufficiently beholden to someone interested in the litigation that he or she

---

[29] *See Guttman v. Huang*, 823 A.2d 492, 502 (Del. Ch. 2003); *Rales*, 634 A.2d at 936.

[30] *Guttman*, 823 A.2d at 501.

[31] *See id.* at 502 (noting that the impartiality inquiry under *Rales* and *Aronson* involves assessing whether plaintiff pleads facts creating a sufficient likelihood of liability for the trading activity).

15

may be unable to consider the demand impartially.[32] On a motion to dismiss a claim for demand futility, the heightened requirement to plead particularized facts under Rule 23.1 is softened by the countervailing requirement that the Court draw all reasonable inferences from such facts in favor of the plaintiff.[33] The Court's task of assessing independence can be a difficult one. It requires considering all of the alleged facts and reasonable inferences that stem from them in their totality, rather than examining each pled fact in isolation.[34] Although plaintiff gets the benefit of all reasonable inferences from the totality of such facts, these inferences "must logically flow from particularized facts alleged by the plaintiff," and plaintiff will not benefit from conclusory allegations.[35]

A director on the Demand Board will lack independence under *Rales* for purposes of Count I only if plaintiff alleges that he or she is beholden to one or more of the targets of the *Brophy* claim (*i.e.*, the Secondary Offering Participants) such that a reasonable doubt exists as to his or her independence in deciding whether to assert that claim. No allegations are made in the Complaint challenging the independence of any of the directors on the Demand Board vis-à-vis any of these individuals other than Pincus or Hoffman. I will next assess the allegations of independence from Pincus and Hoffman on a director-by-director basis.

---

[32] *Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004).

[33] *See Del. Cnty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1020 (Del. 2015).

[34] *See id.* at 1019.

[35] *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) (quoting *Beam*, 845 A.2d at 1048).

16

## 1. Katzenberg

Plaintiff makes no allegations regarding Katzenberg's relationships with Hoffman or Pincus, nor does he suggest that Katzenberg is dependent on his board membership or any other relationship with Zynga such that he could be beholden to Pincus, its controlling stockholder. The Complaint therefore does not raise a reasonable doubt as to Katzenberg's independence for purposes of the *Brophy* claim.

## 2. Meresman

Plaintiff does not allege that Meresman lacks independence from Pincus or that he is dependent on his Zynga board membership. His only allegation regarding Meresman's lack of independence from Hoffman is that he and Hoffman both serve as directors of LinkedIn.[36] Plaintiff does not allege that Hoffman exerts any sort of control over Meresman's board position or that Meresman is dependent on his position on LinkedIn's board. Common membership on the board of another corporation is not a sufficient allegation to raise a reasonable doubt as to Meresman's independence.[37] The Complaint therefore does not raise a reasonable doubt as to Meresman's independence for purposes of the *Brophy* claim.

---

[36] Compl. ¶ 117(i).

[37] *See Beam*, 845 A.2d at 1051 (noting that collegiality and moving in same business circles is insufficient to establish lack of independence); *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *9 (Del. Ch. Jan. 11, 2010) ("That directors of one company are also colleagues at another institution does not mean that they will not or cannot exercise their own business judgment with regard to the disputed transaction.").

### 3. Siminoff

Plaintiff contends that Siminoff lacks independence from Pincus because Siminoff and her husband are co-owners of a private airplane with Pincus.[38] In briefing this motion, plaintiff characterized Siminoff as a "close family friend" of Pincus but added no factual allegations to explain the basis for that characterization.[39] "[T]o render a director unable to consider demand, a relationship must be of a bias-producing nature. Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."[40] Plaintiff's allegations concerning co-ownership of an asset and friendship do not reveal a sufficiently deep personal connection to Pincus so as to raise a reasonable doubt about Siminoff's independence from Pincus.

Plaintiff also alleges that Siminoff lacks independence from Hoffman because they both serve as directors of Mozilla Corporation. This allegation is insufficient for the same reasons regarding Meresman and Hoffman's common board membership discussed above.

### 4. Gordon and Doerr

Plaintiff challenges the independence of Gordon and Doerr in several ways based on their status as partners at Kleiner Perkins Caufield & Byers. To start, plaintiff argues

---

[38] The Complaint does not explain whether there are other co-owners of this airplane.

[39] *See* Pl.'s Ans. Br. 54.

[40] *Beam*, 845 A.2d at 1050.

that Gordon and Doerr lack independence from Hoffman because Hoffman has invested in and sits on the board of Shopkick, Inc., a company in which Kleiner Perkins also has invested. Plaintiff does not attempt to explain how the fact that Gordon and Doerr's employer and Hoffman have invested in the same company would make Gordon and Doerr beholden to Hoffman. Plaintiff instead asserts in conclusory fashion that they would not wish to threaten their relationship as business partners in Shopkick. This allegation does not explain how their relationship as co-investors in Shopkick could be threatened. Even if it did, an alleged risk of straining a business relationship is a far cry from an allegation that one director is beholden to or deeply connected to another. This allegation does not raise a reasonable doubt as to Gordon's and Doerr's independence from Hoffman.

Plaintiff next alleges that Gordon and Doerr "share interlocking business relationships"[41] with Hoffman and Pincus due to investments in One Kings Lane, an e-commerce company Pincus' wife founded. Kleiner Perkins and Hoffman both provided a funding round to One Kings Lane, the amounts of which are not specified in the Complaint. Pincus is implicated by virtue of being the founder's husband. None of these allegations satisfies the *Rales* test. Plaintiff does not explain how investments by Kleiner Perkins in One Kings Lane could make two Kleiner Perkins partners beholden to the founder's spouse (Pincus) or to a fellow investor (Hoffman). The fact that venture

---

[41] Compl. ¶ 117(k).

capitalists and entrepreneurs have overlapping investments as alleged here does not raise a reasonable doubt as to the investors' independence from each other.

In his briefing, plaintiff raises a new allegation that Zynga and certain of its executive officers have invested in Kleiner Perkins funds, thereby compromising Gordon's and Doerr's independence.[42] Plaintiff supports this allegation with an affidavit containing an excerpt from the Prospectus that describes Zynga's investment in the Kleiner Perkins funds as a $500,000 capital subscription. Although the Complaint mentions for different purposes the filings from which plaintiff retrieved this information (the Prospectus and the April 2013 definitive proxy), those filings were not incorporated by reference into or attached to the Complaint. Thus, these new factual allegations are not properly before the Court.[43]

Even if I were to consider this new information, plaintiff does not allege that this $500,000 investment is material to Kleiner Perkins such that its partners would be considered beholden to Pincus. Plaintiff points to *In re Google, Inc. Shareholder Derivative Litigation*[44] for the proposition that these investments could undercut Gordon's and Doerr's independence. In that case, plaintiffs alleged that "Doerr has

---

[42] Pl.'s Ans. Br. 51.

[43] *See Del. Cnty. Emps. Ret. Fund v. Sanchez*, 124 A.3d at 1021 n.14 (declining to consider additional facts regarding director's independence raised in briefing and argument) ("[T]he proper way for the plaintiffs to have used these materials is by seeking to amend their complaint. It is not fair to the defendants, to the Court of Chancery, or to this Court, nor is it proper under the rules of either court, for the plaintiffs to put facts outside the complaint before us.").

[44] 2012 WL 1611064 (N.D. Cal. May 8, 2012).

20

sought substantial investments from Google in private companies in which Kleiner Perkins is a major investor, including one company that was bought by Google in 2007 and that resulted in a $5 million profit for Kleiner Perkins."[45]  Plaintiffs in *Google* thus alleged both the magnitude of profit accruing to Kleiner Perkins as a result of Google's purchase of a company, and that Doerr personally had sought investments from Google. Plaintiff fails to make any such allegations here, instead stating only that Zynga made what appears to be a modest investment in a Kleiner Perkins fund.  These allegations fail to raise a reasonable doubt that Gordon and Doerr lack independence from Pincus.

Finally, plaintiff notes that Zynga's 2013 proxy statement does not list Gordon and Doerr as independent directors under NASDAQ listing rules, although neither the proxy statement nor plaintiff specifies the reason for this.  This Court has noted that stock exchange independence requirements "are a useful source for this court to consider when assessing an argument that a director lacks independence,"[46] but also that the stock exchange requirements are not dispositive.[47]  Director independence under stock

---

[45] *Id.* at *9.

[46] *In re MFW S'holders Litig.*, 67 A.3d 496, 510 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

[47] *See id.* (". . . the fact that directors qualify as independent under the NYSE rules does not mean that they are necessarily independent under our law in particular circumstances . . . .").  The inverse proposition—that a director's lack of independence under stock exchange rules does not necessarily mean the director lacks independence under Delaware law—does not necessarily follow, but the proposition logically runs in both directions.  *See In re EZCORP*, 2016 WL 301245, at *36 ("The fact that a director qualifies as independent for purposes of a governing listing standard is therefore a helpful fact which, all else equal, makes it more likely that the director is independent for purposes of Delaware law. The opposite is likewise true.").

21

exchange rules "is qualitatively different from, and thus does not operate as a surrogate for, this Court's analysis of independence under Delaware law for demand futility purposes."[48]  Stock exchange rules may involve bright-line tests for independence, but Delaware law requires "a case-by-case fact specific inquiry based on well-pled factual allegations."[49]

Plaintiff makes no specific allegations as to why Gordon and Doerr lack independence under the NASDAQ rules, or whether they lack independence under those rules due to a relationship with Pincus, with another executive, or with Zynga itself.  The absence of any such allegations makes it difficult to gauge whether Gordon's and Doerr's lack of NASDAQ independence matters because it is not apparent if it stems from circumstances I already have considered and found insufficient to question their independence under Delaware law, or from something else.  Their status under the NASDAQ rules might have sufficed to raise a reasonable doubt as to their independence if that issue had been a tough call based on the totality of the allegations made in the Complaint.  But that is not the case here.  No aspect of the allegedly interlocking business relationships involving Gordon and Doerr discussed above comes close to creating a reasonable doubt about their independence in my view.  It would be unreasonable, moreover, to infer that their lack of NASDAQ independence resulted from an undisclosed conflict that was significant enough to disqualify them for demand futility

---

[48] *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 61 (Del. Ch. 2015).

[49] *Id.*

purposes, when the underlying factual basis for such an inference is entirely absent from the record. Consequently, drawing all reasonable inferences in plaintiff's favor, Gordon's and Doerr's status under the NASDAQ rules fails to raise a reasonable doubt as to their independence from Hoffman or Pincus for demand futility purposes.

* * * * *

For the reasons explained above, I conclude that plaintiff has raised no reasonable doubt regarding the disinterestedness or independence of five of the nine directors on the Demand Board (Katzenberg, Meresman, Siminoff, Gordon, and Doerr) with respect to the *Brophy* claim. For this reason, Count I is dismissed for failure to allege demand futility under the *Rales* test.

In considering the question of independence for Count I, I have focused on the independence of these five directors vis-à-vis the targets of the *Brophy* claim, namely the Secondary Offering Participants, which include Pincus and Hoffman. Count II is directed against the members of the Secondary Offering Board, and Count III is directed against all defendants. The question of independence for those claims thus implicates whether any of the directors on the Demand Board lacks independence from any other member of the Secondary Offering Board (for Count II) or any of the defendants (for Count III) aside from the allegations concerning Pincus and Hoffman addressed above. That issue

23

is easily resolved, as the Complaint, with one exception, does not contain any such allegations.[50]

### C. Demand Is Not Excused for the Secondary Offering Claim

Count II of the Complaint asserts that the Secondary Offering Board breached its fiduciary duties in approving the Secondary Offering and the Lock-Up restructuring.[51] Plaintiff does not take a position in his brief whether the *Aronson* test or the *Rales* test should apply to this claim. Plaintiff instead argues simply that a majority of the Demand Board would be unable to impartially consider a demand relating to the Secondary Offering because six of its nine members "were involved with the approval of the Offering and Lock-Up restructuring which is subject to an entire fairness review."[52] Before analyzing this issue, I address what test should apply to determine whether demand is excused as to Count II.

---

[50] The exception is the allegation, discussed below, that "Doerr would not threaten his ongoing business relationship with Gordon by voting to initiate litigation against Gordon" because they are both partners at Kleiner Perkins. Compl. ¶ 117(g).

[51] Compl. ¶¶ 124-28. Although the Complaint also referred to the Audit Committee's waiver of the trading restrictions, *see* Compl. ¶¶ 58, 126, plaintiff made little effort to advance a demand futility argument in its brief based on the trading restriction waivers. In any event, demand would not be excused for the trading restriction waivers for the same reason that it is not excused for the Secondary Offering Board's decision to restructure the Lock-Ups—that is, plaintiff has failed to allege particularized facts providing a reason to doubt the impartiality of a majority of the directors on the Demand Board to decide whether to initiate or to refrain from initiating litigation against any of the directors on the Secondary Offering Board, which would include the members of its Audit Committee.

[52] Pl.'s Ans. Br. 36.

24

At a superficial level, a good argument could be made under past precedents to apply the *Aronson* test to Count II because it involves an affirmative decision of the Secondary Offering Board, a majority of whom continued to serve on the Demand Board. In my opinion, however, Count II should be evaluated under the *Rales* test.

As noted above, the *Aronson* test requires the plaintiff to plead facts that create a reasonable doubt either that (1) "the directors are disinterested and independent" or (2) "the challenged transaction was otherwise the product of a valid exercise of business judgment."[53] The challenge in applying this test when the composition of a board has changed concerns the second prong because it focuses on the board that approved the underlying transaction rather than the board that must decide whether the corporation should enter litigation in response to a demand.

In *Harris v. Carter*, Chancellor Allen noted that "*Aronson* has been criticized as focusing the test for futility on the wrong time,"[54] probably because in most cases (including *Aronson* itself) "the board that approves 'the challenged transaction' and the board upon whom a demand could be made is one and the same."[55] Chancellor Allen

---

[53] *Aronson*, 473 A.2d at 814.

[54] 582 A.2d 222, 229 (Del. Ch. 1990).

[55] *Id. See also Aronson*, 473 A.2d at 810-12 (noting that "futility is gauged by the circumstances existing at the commencement of a derivative suit" and that "if the underlying transaction supported a reasonable inference that the business judgment rule did not apply, then the directors who approved the transaction were potentially liable for a breach of their fiduciary duty, and thus, could not impartially consider a stockholder's demand.").

went on to explain that the operative focus should be on the impartiality of the board in place at the time of the demand and not at the time of the challenged transaction:

> What, in the end, is relevant is not whether the board that approved the challenged transaction was or was not interested in that transaction but whether the present board is or is not disabled from exercising its right and duty to control corporate litigation. I do not consider that *Aronson* intended to determine that demand under Rule 23.1 upon an independent board that has come into existence after the time of the "challenged transaction" would be excused if the board that approved the challenged transaction did not qualify for business judgment protection.[56]

Three years later, in *Rales*, in the context of deciding a certified question, the Delaware Supreme Court acknowledged that the *Aronson* test was not suited to address all questions of demand futility and identified three scenarios in which it would not apply:

> Consistent with the context and rationale of the *Aronson* decision, a court should not apply the *Aronson* test for demand futility where the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit. This situation would arise in three principal scenarios: (1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced, (2) where the subject matter of the derivative suit is not a business decision of the board, and (3) where, as here, the decision being challenged was made by the board of a different corporation.[57]

In identifying these three scenarios, the Court included a qualification that they were the "principal" scenarios where *Aronson* would not apply, implying that there could be other scenarios. In my opinion, this case presents such a scenario.

---

[56] *Harris v. Carter*, 582 A.2d at 230.

[57] *Rales*, 634 A.2d at 934.

Here, a majority of the members of the Secondary Offering Board had a personal financial interest in the transaction such that they may have received an unfair benefit and the transaction may be subjected to entire fairness review.[58] Furthermore, because a majority of the directors from the Secondary Offering Board were not replaced, none of the exceptions identified in *Rales* applies here. Critically, however, enough of the *interested* members of that board were replaced (and an additional director was added) so that the Demand Board had a majority of directors (seven of nine) who derived no personal financial benefit from the challenged transaction. To my mind, it makes no sense under these circumstances to focus any aspect of the demand futility inquiry on the board that approved the underlying transaction, as the second prong of *Aronson* contemplates. Just as Chancellor Allen realized in *Harris v. Carter* that *Aronson*'s second prong should not excuse demand when a disinterested new board steps in, demand here should not be excused if a majority of the Demand Board can impartially consider a demand, even when less than a majority of them were replaced.

To be clear, the *Rales* test investigates the same sources of potential partiality that *Aronson* would examine. As many members of this Court have recognized, the *Rales* test functionally covers the same ground as the *Aronson* test in determining the impartiality of

---

[58] *See Lee v. Pincus*, 2014 WL 6066108, at *13 (concluding that plaintiff had "pled facts sufficient to rebut the business judgment standard of review because the lockup restructuring was not approved by a majority of disinterested and independent directors.").

directors.[59]    That ground focuses on three circumstances that may cast doubt on a director's impartiality.    First, a director may have a personal interest in considering a plaintiff's litigation demand because the director obtained a financial benefit from the challenged transaction not shared by the stockholders generally, raising the risk of liability for self-dealing.    Second, a director may have a personal interest in considering a plaintiff's litigation demand because the director otherwise faces a substantial risk of liability in the litigation, such as for approving the challenged transaction in bad faith so as to be susceptible to a non-exculpated claim for breach of fiduciary duty.    Third, a director may lack independence from someone who is at risk of liability under those first two categories because the director is controlled by or beholden to such person.

---

[59] *See, e.g.*, *Guttman v. Huang*, 823 A.2d at 501 (Strine, V.C.) ("Upon closer examination, however, that singular inquiry [under *Rales*] makes germane all of the concerns relevant to both the first and second prongs of *Aronson*."); *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *16 (Del. Ch. May 21, 2013) (Laster, V.C.) (noting that the *Rales* test asks questions regarding a director's risk of liability in the litigation that are "precisely the questions that *Aronson* asks"); *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006) (Lamb, V.C.) ("This court has held in the past that the *Rales* test, in reality, folds the two-pronged *Aronson* test into one broader examination.    It allows, in other words, a court to determine both whether a corporate board on which demand might be made is disinterested and independent, and whether a majority of directors face a substantial likelihood of personal liability, because doubt has been created as to whether their actions were products of a legitimate business judgment.") *aff'd*, 911 A.2d 802 (Del. 2006); *see also* 2 David A. Drexler et al., *Delaware Corporation Law and Practice* § 42.03[2][a] at 42-15 to -16 (2015) (interpreting *Aronson*'s first prong analysis as regarding "interested director transactions" in which directors "had personally profited from a challenged transaction" and its second prong analysis as regarding "complaints not involving directorial self-dealing" wherein "the threat of personal liability for having approved the challenged transaction" was at issue, requiring particularized facts showing likelihood of liability based on transactional flaws).

The utility of the *Rales* test is not that it examines different subject matter from that of the *Aronson* test, but that it provides a cleaner, more straightforward formulation to probe the core issue in the demand futility analysis for each board member who would be considering plaintiff's demand: "whether there is a reason to doubt the impartial[ity] of the directors, who hold the authority under 8 *Del. C.* § 141(a) to decide [for the corporation] 'whether to initiate, or refrain from entering, litigation.'"[60] Applying *Rales*, I will now assess whether plaintiff has alleged facts creating a reasonable doubt that a majority of the Demand Board directors could impartially decide whether to pursue plaintiff's Secondary Offering claim.

Beginning with the independence of the Demand Board directors, as I concluded above, Katzenberg, Siminoff, Meresman, Gordon, and Doerr are independent from Pincus and Hoffman.[61] Plaintiff only makes one other allegation regarding the independence of any of these directors—specifically, that Doerr would not wish to initiate litigation against Gordon, his partner at Kleiner Perkins. Plaintiff does not allege that Doerr is beholden to Gordon or that they have any relationship aside from being partners at the same venture capital firm. Without more, these allegations do not cast a

---

[60] *See Teamsters Union 25*, 119 A.3d at 67 (Del. Ch. 2015) (quoting *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981)). Indeed, although I recognize that the Supreme Court in *Rales* declined to adopt a "universal demand requirement," *Rales*, 634 A.2d at 934, it is not apparent what scenario implicating a question of demand futility could not sensibly be analyzed under the *Rales* test given how it has now been applied for over two decades.

[61] *See supra* Part II.B.

reasonable doubt on his independence from Gordon.[62]   Consequently, none of these directors lacks independence for demand futility purposes concerning Count II.

Siminoff and Doerr, both of whom joined Zynga's board after approval of the Secondary Offering, as well as Katzenberg, Meresman, and Gordon, did not sell shares in the Secondary Offering and thus derived no personal financial benefit from it.  Thus, the only open question concerning the impartiality of these five individuals is whether any of them who served on the Secondary Offering Board (*i.e.*, Katzenberg, Meresman or Gordon) could be interested based on the theory that they face substantial litigation risk for approving the Secondary Offering, thereby potentially biasing their decision whether to pursue litigation.

Plaintiff asserts that entire fairness review will apply to the decision to approve the Secondary Offering because it was approved by an interested majority of directors.[63] Relying on *In re China Agritech, Inc.*, plaintiff argues that the non-selling directors on the Secondary Offering Board are interested because of the litigation risk they would face in an entire fairness challenge.[64]   After *China Agritech* was decided, however, the Delaware Supreme Court made clear in *Cornerstone Therapeutics* that, even if the entire

---

[62] *See supra* note 37.

[63] Paul did not participate in the meeting during which the Secondary Offering Board voted to approve the transaction.  Consequently, directors planning to sell shares in the Secondary Offering accounted for four out of the seven votes in favor of the transaction.

[64] *See In re China Agritech*, 2013 WL 2181514, at *17 (determining that litigation risk Audit Committee members faced regarding an entire fairness challenge to a certain transaction raised "reasonable doubt about their ability to disinterestedly consider a litigation demand").

fairness standard applies to the Court's review of a transaction, a "plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision" to state a viable claim against that director.[65]

Zynga's charter contains an exculpatory 102(b)(7) provision.[66] Thus, to show that a particular director is interested based on the theory that the director faces a substantial risk of personal liability for approving the Secondary Offering,[67] plaintiff must plead particularized facts demonstrating an intentional dereliction of duties or conscious disregard for the directors' responsibilities, such that a reasonable inference of bad faith or a breach of the duty of loyalty exists that would overcome the exculpatory provision in Zynga's certificate of incorporation.[68]

---

[65] *See In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1175 (Del. 2015).

[66] Rohrer Aff. Ex. 11 (Sixteenth Amended and Restated Certificate of Incorporation of Zynga Inc.) at Art. IX ("To the fullest extent permitted by law, no director of the corporation shall be personally liable for monetary damages for breach of fiduciary duty as a director of the Corporation."). I may take judicial notice of the contents of Zynga's certificate of incorporation. *See Zucker v. Andreessen*, 2012 WL 2366448, at *1 n.1 (Del. Ch. June 21, 2012) ("Delaware courts may take judicial notice of certificates of incorporation filed with the Secretary of State on a motion to dismiss under Rule 23.1.").

[67] *See Rattner v. Bidzos*, 2003 WL 22284323, at *9 (Del. Ch. Sept. 30, 2003).

[68] *See In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *12 (Del. Ch. Oct. 12, 2011) (noting that because of 102(b)(7) clause, plaintiff must make particularized allegations of scienter or bad faith); *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 647-48 (Del. Ch. 2008) (requiring plaintiffs to "plead specific facts that support the inference that the Lear directors breached their fiduciary duty of loyalty" because a 102(b)(7) clause prevented liability for care breaches, including gross negligence).

31

This analysis is irrelevant to Siminoff and Doerr, who were not on the board at the time of the Secondary Offering. That leaves Gordon, Katzenberg, and Meresman. Plaintiff does not allege particularized facts leading to a reasonable inference that any of them consciously disregarded their duties in approving the Secondary Offering. Plaintiff's arguments generally focus on the directors' knowing approval of the Secondary Offering and on the fact that the Secondary Offering was approved by a majority-conflicted board at the time. But plaintiff makes no particularized allegations that Gordon, Katzenberg, or Meresman knowingly failed to inform themselves about the Secondary Offering or otherwise consciously disregarded their directorial duties, as is required to allege a non-exculpated claim against them. Consequently, although the transaction itself may be subject to entire fairness review, plaintiff has not pled particularized allegations against a majority of the Demand Board members demonstrating that they face a substantial litigation risk for approving the Secondary Offering.[69]

\* \* \* \* \*

Because at least five directors on the Demand Board are independent and disinterested for purposes of the Secondary Offering claim, plaintiff fails to allege that demand would be futile, and Count II is dismissed.[70]

---

[69] *See Teamsters Union 25*, 119 A.3d at 65 n.121 (declining to excuse demand under second prong of *Aronson* even when transaction may be subject to entire fairness review).

[70] Although I need not analyze more than five directors, I would reach the same conclusion regarding Paul, who did not participate in the Secondary Offering or even vote to approve it.

32

## D. Demand Is Not Excused for the *Caremark* Claim

Count III is essentially a *Caremark* claim against all defendants alleging that they failed to ensure that Zynga maintained adequate controls regarding its public disclosures and failed to disclose material information to the public.[71] For instance, plaintiff alleges that the Prospectus drew an overly optimistic picture of Zynga's financial situation, while defendants knew of or recklessly disregarded recent negative trends, including in ABPU and DAU. Regarding the change to the Facebook algorithm, plaintiff alleges that Pincus would have been aware of these changes before they were implemented, due to his relationship with Facebook's CEO. The Complaint also alleges that defendants authorized or failed to monitor practices that resulted in legal and regulatory violations.

The *Rales* test applies here because the claim in question "is not a business decision of the Board but rather a violation of the Board's oversight duties."[72] I will therefore assess whether plaintiff has alleged a reasonable doubt that a majority of the Demand Board directors would be independent and disinterested in deciding whether to pursue plaintiff's *Caremark* claim.

### 1. Siminoff and Doerr

Siminoff and Doerr are disinterested because they joined the board after the alleged *Caremark* violations occurred. As to their independence, they are independent

---

[71] Compl. ¶ 131.

[72] *Wood v. Baum*, 953 A.2d at 140. *See also In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *6 n.25 (Del. Ch. Jan. 11, 2010) ("Plaintiffs' other claims as to failure to supervise (enabling bribery and insider trading) are not board decisions and, thus, are appropriately analyzed under *Rales*.").

from defendants for the reasons explained above.[73]  Siminoff and Doerr are therefore impartial for purposes of Count III.

### 2. Katzenberg, Gordon, and Meresman

As explained above, there is no reasonable doubt as to whether Katzenberg, Gordon, and Meresman are independent from defendants.[74]  This leaves the question of whether they are disinterested.  In the context of an alleged oversight violation, there is no transaction in which the directors may be interested.  Thus, for the directors to have a disabling interest, they must face meaningful litigation risk with a substantial likelihood of personal liability for the alleged violation.[75]

Plaintiff argues that Zynga's directors who were on the board at the time of the Secondary Offering and the alleged disclosure failures, including Katzenberg, Gordon, and Meresman, face a substantial likelihood of personal liability for the alleged *Caremark* violations.  A *Caremark* claim "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment" in the absence of a conflict of interest or other suspect circumstances.[76]  Katzenberg, Gordon, and Meresman face no such circumstances here.  Because Zynga has a 102(b)(7) provision, they would not face a substantial likelihood of personal liability unless plaintiff pleads a non-

---

[73] *See supra* Parts II.B.3-4 and II.C.

[74] *See supra* Part II.B.

[75] *See Rattner v. Bidzos*, 2003 WL 22284323, at *9.

[76] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d at 967.

exculpated claim by alleging that the directors acted in bad faith or consciously disregarded their directorial responsibilities.[77]

Despite these significant pleading hurdles, plaintiff alleges that the directors were exposed to a substantial threat of liability stemming from their failure to ensure that Zynga maintained adequate systems and controls relating to its public disclosures, which caused Zynga to make public statements containing material omissions.[78] He further argues that the directors ignored two red flags: the request in March 2012 to waive trading restrictions pertaining to the Secondary Offering during a period of declining business prospects, and the decision not to write down the value of the OMGPOP assets until October 2012 even though those assets allegedly should have been impaired much earlier.[79] The fatal problem with these allegations is that the Complaint does not contain particularized facts linking them to the outside directors' knowledge or actions.[80]

---

[77] *See supra* Part II.C and note 69.

[78] Compl. ¶¶ 131-32; Pl.'s Ans. Br. 40-42.

[79] Pl.'s Ans. Br. 42-43.

[80] *See In re China Auto. Sys. Inc. Deriv. Litig.*, 2013 WL 4672059, at *8 (Del. Ch. Aug. 30, 2013) (rejecting *Caremark* derivative claim) ("Nowhere within the Complaint are allegations of particularized facts about the Defendants' knowledge of any 'red flags.' Nothing is alleged about any specific deficiencies of the Company's or Audit Committee's internal financial controls during the Relevant Period. And, the Complaint lacks particularized allegations about any Defendant's conscious disregard of Board or Committee meetings or responsibilities."); *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 128 (Del. Ch. 2009) ("Plaintiffs fail to plead 'particularized facts suggesting that the Board was presented with 'red flags' alerting it to potential misconduct' at the Company.").

For instance, plaintiff alleges that even though some of Zynga's user metrics were trending downward in early 2012, a service known as AppData reported upward trends to investors.[81] Plaintiff does not plead any facts, however, suggesting that any of the outside directors were involved in creating the information that AppData allegedly disseminated. In fact, the Complaint admits that AppData only provides estimates because it does not have access to any internal company metrics.[82] Plaintiff does allege that certain members of Zynga's management (including defendants Pincus, Schappert, Wehner, and Van Natta) received daily reports of Zynga's daily average users and were therefore aware that the company's daily average users had leveled off before the Secondary Offering. Critically, however, plaintiff does not allege that any outside directors, including Katzenberg, Gordon, and Meresman, received this information. Plaintiff makes other similar allegations without pleading facts suggesting knowledge by the outside directors.

Similarly, plaintiff asserts that defendants knowingly or recklessly increased Zynga's earnings guidance despite powerful indications to the contrary. Specifically, referring generally to the "defendants," he states that they failed to disclose:

> (i) that Zynga's publicly announced projections were overly optimistic and unattainable; (ii) the ABPU was experiencing a negative trend; (iii) the DAU was stagnating during 1Q2012; (iv) the negative Facebook feed trend was exasperated by the Facebook algorithm change; (v) the delay in launching *The Ville*; (vi) the OMGPOP asset was substantially impaired.[83]

---

[81] Compl. ¶¶ 73-76.

[82] Compl. ¶ 29.

[83] Compl. ¶ 131.

Again, the fatal problem with these allegations is that they are not made with particularity against the outside director defendants. To the contrary, plaintiff alleges that *internal* management received regular updates in user trend data,[84] that the weekly bookings reports containing delays and other negative information about important Zynga games including *The Ville* were "internal" documents,[85] and that changes to Facebook's algorithms and associated negative Facebook feed trends were discussed in internal company e-mails, through alleged conversations between Pincus and Facebook's CEO, and via a notification to Pincus and Schappert.[86] Missing from this list are any allegations that the outside directors, including Katzenberg, Gordon, and Meresman, saw any of these alleged red flags.

Plaintiff's allegations against the outside directors regarding the OMGPOP impairment fare no better. Plaintiff challenges the failure to write down the assets of OMGPOP as impaired until October 2012, despite substantial decreases in the projected users of *Draw Something*, its most important game, in May and June 2012. None of these allegations, however, specifically mentions the outside directors. Plaintiff further

---

[84] Plaintiff quotes a passage in the Prospectus stating that ABPU "provides useful information to investors and others in understanding and evaluating our results in the same manner as our management and board of directors." Compl. ¶ 70 (quoting Prospectus at 42). This passage may support plaintiff's contention that the metric is an important one, but it does not speak to the frequency with which the outside directors received this information.

[85] Compl. ¶¶ 46, 83.

[86] Compl. ¶¶ 72-73, 86.

alleges that the company's finance team prepared an impairment analysis in June 2012 that determined OMGPOP did not need to be impaired at the time. Whether or not the conclusion of that analysis was correct, which the parties vigorously dispute, it hardly raised a "red flag" of the need to take an impairment charge at the time even if one assumes that the outside directors saw it—a fact which is not alleged.

Finally, plaintiff alleges that at various times the Audit Committee discussed Zynga's financial results and earnings press releases for 2011 and for the first quarter of 2012, statements related to the Secondary Offering, and the acquisition of OMGPOP. These allegations implicate Meresman, who was a member of the Audit Committee. But the Complaint is devoid of allegations that the Audit Committee received or reviewed other internal forecasts or financial metrics, game-specific performance data, or information about the OMGPOP impairment decision.

Citing *Pfeiffer v. Toll*, plaintiff argues that allegations pled generally against the defendants without differentiating among them are sufficient to establish demand futility because knowledge of core financials fundamental to the business should be imputed to outside directors.[87] *Pfeiffer* is distinguishable for a significant reason. There, as the Court made clear, the allegations of the outside directors' knowledge were being assessed on the lower pleading standard of Rule 12(b)(6) rather than the heightened pleading

---

[87] *Pfeiffer v. Toll*, 989 A.2d 683, 693 (Del. Ch. 2010) ("It would afford an ostrich-like immunity to directors not to grant the plaintiff a Rule 12(b)(6) inference that the Outside Director Defendants knew about core information of this type."), *abrogated on other grounds by Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831 (Del. 2011).

standard of Rule 23.1.[88]  Indeed, the Court in *Pfeiffer* distinguished other decisions of this Court precisely because they "were decided under Rule 23.1's particularity standard and in a procedural posture where the plaintiff sought to establish demand futility by showing that the directors faced a substantial risk of liability."[89]  Additionally, the outside directors in *Pfeiffer* sold substantial amounts of their stock during the period in question, giving rise to a potential inference that they were aware of negative information.  No such allegations are pled here to support such inferences.

In sum, without particularized allegations that Katzenberg, Gordon, or Meresman knew of recent internal company data, plaintiff's "red flags" allegations against them boil down to the contention that they should have known trouble was afoot at the company merely because the Secondary Offering was proposed.  It is not reasonable to infer, however, that the mere proposal to conduct the Secondary Offering served as a "red flag" if the outside directors are not alleged to have had knowledge of non-public negative trends. The Secondary Offering had the stated purpose of facilitating an orderly distribution of shares and increasing Zynga's public float,[90] and was not inherently

---

[88] *Id.* at 691-93 ("The Complaint is not subject to any heightened pleading standard. . . . Although a plaintiff must plead with particularity when attempting to establish demand futility, that is not the issue here. I have already held that demand is futile in light of the companion federal securities action, which brings the role of Rule 23.1 to a close. . . . Outside of the procedural context of Rule 23.1, a complaint need only plead a reasonable basis from which knowledge can be inferred. . . . Several factors combine to convince me that knowledge and use of inside information is adequately pled under the plaintiff-friendly Rule 12(b)(6) standard.").

[89] *Id.* at 693.

[90] Compl. ¶ 59.

suspect. Consequently, these three outside directors are disinterested because they face no meaningful risk of liability for a *Caremark* claim.

* * * * *

For the reasons explained above, five of the nine members of the Demand Board were disinterested and independent with respect to the *Caremark* claim. Accordingly, Count III is dismissed for failure to plead demand futility.

### E. Lack of Impartiality Due to Related Litigation

Plaintiff makes a standalone argument that the directors on the Secondary Offering Board "would be unable to impartially consider a litigation demand in this Action for fear that it would undercut their defense" in the Delaware Class Action, relying again on *Pfeiffer v. Toll*.[91] This argument is inapplicable to Doerr and Siminoff, who joined the Zynga board after the Secondary Offering and were not named as defendants in that action. As for Katzenberg, Meresman, and Gordon, none of them faces a substantial risk of liability for the claims in the Delaware Class Action given Zynga's 102(b)(7) exculpatory provision and the Delaware Supreme Court's decision in *Cornerstone* for the reasons discussed above.[92]

*Pfeiffer* is distinguishable. In that case, the Court concluded that the board was unable to consider a demand impartially in light of the fact that the directors were named

---

[91] Pl.'s Ans. Br. 45-46.

[92] *See supra* Part II.C. Katzenberg, Paul, and Meresman were voluntarily dismissed from the Delaware Class Action in August 2015, a few months after *Cornerstone* was decided. Because the Demand Board is assessed at the time the Complaint is filed, their subsequent dismissal does not factor into my analysis.

40

as defendants in a related federal securities action that had "survived a motion to dismiss under the rigorous standards for pleading securities fraud."[93]   Here, no ruling on the sufficiency of the allegations in the Delaware Class Action had been made when the Complaint was filed in this action.[94]

Finally, plaintiff raises in briefing the threat of liability associated with the *Reyes* case.  His argument for demand futility because of *Reyes* fails for two reasons.  First, the Complaint does not refer to *Reyes*.  Although *Reyes* was pending when plaintiff filed this action, he failed even to mention its existence in his Complaint and did not amend the Complaint to include it later.  Thus, these allegations are not properly before the Court.[95]

Second, the late-raised allegations in plaintiff's brief concerning the *Reyes* case fail to cast a reasonable doubt as to the outside directors' disinterestedness because they are superficial and conclusory.  Plaintiff alleges that the outside directors potentially may be liable for alleged violations of Section 11 of the Securities Act and cites one paragraph of the *Reyes* complaint to note that the complaint "contested both statements of fact and

---

[93] *Pfeiffer v. Toll*, 989 A.2d at 690.

[94] Plaintiff points out that the United States District Court for the District of Delaware had denied a motion to dismiss the Delaware Class Action, which had been removed to federal court.  Pl.'s Ans. Br. 46.  The district court's denial of defendants' motion to dismiss did not address the merits of the claims.  The district court considered whether those claims were preempted under the Securities Litigation Uniform Standards Act, and concluded that the case should be remanded to the Court of Chancery.  *See Lee v. Pincus*, 2013 WL 6804640, at *2 (D. Del. Dec. 23, 2013).

[95] *See supra* note 43.

41

opinion"[96] and that it alleged that the directors "issued false and misleading statements and omitted material information from the Prospectus."[97] But plaintiff provides no further support or explanation for how the directors would face a substantial risk of liability in *Reyes*.[98] Plaintiff's late-raised allegations regarding the *Reyes* case are too vague and conclusory to cast a reasonable doubt as to the outside directors' disinterestedness.

Because neither the Delaware Class Action nor the *Reyes* case raises any reasonable doubts as to the outside directors' impartiality, these arguments do not change the conclusion that the Demand Board was not disabled from deciding whether to pursue any of plaintiff's claims.[99]

## III. CONCLUSION

For the foregoing reasons, plaintiff has failed to demonstrate that demand would have been futile with respect to any of the claims in the Complaint. Accordingly, defendants' motion to dismiss is GRANTED.

**IT IS SO ORDERED.**

---

[96] Pl.'s Ans. Br. 46.

[97] Pl.'s Ans. Br. 16.

[98] Plaintiff does argue that the survival of a motion to dismiss would have increased the directors' risk of liability, but this did not occur until several months after he filed the Complaint.

[99] Although the Complaint referenced the federal securities action, plaintiff did not challenge in his brief the impartiality of the Demand Board based on the claims asserted in that action, presumably because Zynga's outside directors were not defendants in that case when this action was filed.

42